ARTHUR et al. v. OAKES et al.

(Circuit Court of Appeals, Seventh Circuit.   October 1, 1894.)

No. 169.

1. RAILROAD EMPLOYES—QUITTING SERVICE WITHOUT CAUSE—LIABILITIES.

If an employe of a railroad company quits without cause, and in violation of an express contract to serve for a stated time, then his quitting would not be of right, and he would be liable for any damages resulting from a breach of his agreement, and, perhaps, in some states of case, to criminal prosecution for loss of life or limb by passengers or others. directly resulting from his abandoning his post at a time when care and watchfulness was required upon his part in the discharge of a duty he had undertaken to perform.

2. SAME—INVOLUNTARY SERVITUDE.

It would be an invasion of one's natural liberty to compel him to work for, or to remain in the personal service of, another. One who is placed under such restraint is in a condition of involuntary servitude,—a condition which the supreme law of the land declares shall not exist within the United States, or in any place subject to their jurisdiction.

3. SAME—CONTRACT OF EMPLOYMENT—REMEDIES FOR BREACH.

The rule, we think, is without exception that equity will not compel the actual, affirmative performance by an employé of merely personal services. any more than it will compel an employer to retain in his personal service one who, no matter for what cause, is not acceptable to him for service of that character. The right of an employé, engaged to perform personal service, to quit that service, rests upon the same basis as the right of his employer to discharge him from further personal service. If the quitting in the one case, or the discharging in the other, is in violation of the contract between the parties, the one injured by the breach has his action for damages; and a court of equity will not, indirectly or negatively, by means of an injunction restraining the violation of the contract, compel the affirmative performance from day to day, or the affirmative acceptance, of merely personal services. Relief of that character has always been regarded as impracticable.

4. SAME.

Undoubtedly, the simultaneous cessation of work by any considerable number of the employés of a railroad corporation without previous notice will have an injurious effect, and for a time inconvenience the public. But these evils, great as they are, and although arising in many cases from the inconsiderate conduct of employés and employers, both equally indifferent to the general welfare, are to be met and remedied by legislation restraining alike employés and employers, so far as necessary adequately to guard the rights of the public as involved in the existence, maintenance, and safe management of public highways. In the absence of legislation to the contrary, the right of one in the service of a quasi public corporation to withdraw therefrom at such time as he sees fit, and the right of the managers of such a corporation to discharge an employé from service whenever they see fit, must be deemed so far absolute that no court of equity will compel him, against his will, to remain in such service or actually to perform the personal acts required in such employments, or compel such managers, against their will, to keep a particular employé in their service.

5. SAME—EQUITY JURISDICTION—PERFORMANCE OF CONTRACT.

The fact that employés of railroads may quit under circumstances that would show bad faith upon their part, or a reckless disregard of their contract or of the convenience and interests of both employer and the public, does not justify a departure from the general rule that equity will not compel the actual, affirmative performance of merely personal services, or (which is the same thing) require employés, against their will, to remain in the personal service of their employer.

6. RAILROAD EMPLOYES—QUITTING SERVICE OF RECEIVER.

These employés having taken service first with the company, and afterwards with the receivers, under a general contract of employment which did not limit the exercise of the right to quit the service, their peaceable co-operation, as the result of friendly argument, persuasion, or conference among themselves, in asserting the right of each and all to refuse further service under a schedule of reduced wages, would not have been illegal or criminal, although they may have so acted in the firm belief and expectation that a simultaneous quitting without notice would temporarily inconvenience the receivers and the public. If in good faith, and peaceably, they exercise their right of quitting the service, intending thereby only to better their condition by securing such wages as they deem just, but not to injure or interfere with the free action of others, they cannot be legally charged with any loss to the trust property resulting from their cessation of work in consequence of the refusal of the receivers to accede to the terms upon which they were willing to remain in the service. Such a loss, under the circumstances stated, would be incidental to the situation, and could not be attributed to employés exercising their lawful rights in orderly ways, or to the receivers when, in good faith and in fidelity to their trust, they declare a reduction of wages, and thereby cause dissatisfaction among employés, and their withdrawal from service.

7. CONSPIRACY—WHEN ILLEGAL.

According to the principles of the common law, a conspiracy upon the part of two or more persons, with the intent, by their combined power, to wrong others or to prejudice the rights of the public, is in itself illegal, although nothing be actually done in execution of such conspiracy. This is fundamental in our jurisprudence. So, a combination or conspiracy to procure an employé or body of employés to quit service in violation of the contract of service would be unlawful, and in a proper case might be enjoined, if the injury threatened would be irremediable at law.

8. SAME.

An intent, upon the part of a single person, to injure the rights of others or of the public, is not in itself a wrong of which the law will take cognizance, unless some injurious act be done in execution of the unlawful intent; but a combination of two or more persons with such an intent, and under circumstances that give them, when so combined, a power to do an injury they would not possess as individuals acting singly, has always been recognized as in itself wrongful and illegal.

9. UNLAWFUL COMBINATION OF EMPLOYES.

It seems entirely clear, upon authority, that any combination or conspiracy upon the part of these employés would be illegal which has for its object to cripple the property in the hands of the receivers, and to embarrass the operation of the railroads under their management, either by disabling or rendering unfit for use engines, cars, or other property in their hands, or by interfering with their possession, or by actually obstructing their control and management of the property, or by using force, intimidation, threats, or other wrongful methods against the receivers or their agents, or against employés remaining in their service, or by using like methods to cause employés to quit, or prevent or deter others from entering the service in place of those leaving it.

10. SAME.

The act of congress of June 29, 1886, legalizing the incorporation of national trade unions (24 Stat. 86, c. 567), does not sanction illegal combinations.

11. STRIKE—WHEN ILLEGAL.

In the absence of evidence, it cannot be held, as a matter of law, that a combination among employés, having for its object their orderly withdrawal in large numbers, or in a body, from the service of their employers, on account simply of a reduction in their wages, is not a "strike," within the meaning of that word as commonly used. Such a withdrawal, although amounting to a strike, is not illegal or criminal.

12. SAME—INTERFERENCE BY EQUITY.
    Circumstances stated under which a court of equity may interfere to prevent strikes or illegal interference with property.

Appeal from the Circuit Court of the United States for the Eastern District of Wisconsin.

Petition by P. M. Arthur and others to modify certain injunctions issued in a consolidated suit brought by the Farmers' Loan & Trust Company and others against the Northern Pacific Railroad Company and its receivers, Thomas F. Oakes, Henry C. Payne, and Henry C. Rouse. 60 Fed. 803. The injunctions were only modified in part, and the petitioners appeal.

Quarles, Spence & Quarles, for appellants.

George P. Miller, for appellees.

Before HARLAN, Circuit Justice, WOODS, Circuit Judge, and BUNN, District Judge.

HARLAN, Circuit Justice. The questions before us relate to the power of a court of equity, having custody by receivers of the railroad and other property of a corporation, to enjoin combinations, conspiracies, or acts upon the part of the receivers' employés and their associates in labor organizations, which, if not restrained, would do irreparable mischief to such property, and prevent the receivers from discharging the duties imposed by law upon the corporation.

The original bill was filed on behalf of stockholders and creditors of the Northern Pacific Railroad Company, a corporation created by an act of congress, and had for its general object the administration under the direction of the court of the entire railroad system, lands, and assets of that corporation, and the enforcement of the respective rights, liens, and equities of its preferred and common stockholders, bondholders, and creditors.

The railroad company having filed its answer, receivers were appointed, with authority to take immediate possession of its railroads and other property, and to exercise its authority and franchises, conduct its business and occupation as a carrier of passengers and freight, discharge the public duties obligatory upon it, or upon any of the corporations whose lines of road were in its possession, preserve the property in proper condition and repair so as to be safely and advantageously used, protect the title and possession of the same, and employ such persons and make such payments and disbursements as were needful. The receivers were also authorized to manage all other property of the company at their discretion, and in such manner as in their judgment would produce the most satisfactory results consistent with the discharge of the public duties imposed on them, and to fix the compensation of officers, attorneys, managers, superintendents, agents, and employés in their service. It was further ordered that an injunction issue against the defendant and all claiming to act by, through, or under it, and against all other persons, to restrain them from interfering with the receivers in taking possession of and managing the property.

Subsequently the Farmers' Loan & Trust Company, as trustee for the holders of bonds and collateral trust indentures, filed an original bill in the same court against the Northern Pacific Railroad Company, the individual plaintiffs in the first suit, and the receivers. The relief asked was that the plaintiff, as trustee under the mortgages named in the bill, be placed in possession of the mortgaged premises, or that receivers of the rights, franchises, and property of the railroad company be appointed with authority to operate its railroads and carry on its business under the protection of the court; that the liens created by the several mortgages be ascertained and declared; and that the mortgaged property, in certain contingencies, be sold, and the proceeds applied according to the rights of parties.

The railroad company having appeared in that suit, an order was entered appointing the same persons receivers who were appointed in the first suit, and the two suits were consolidated, to proceed together under the title of the Farmers' Loan & Trust Company v. Northern Pacific Railroad Company, etc.

By a writ of injunction dated December 19, 1893, the officers, agents, and employés of the receivers, including engineers, firemen, trainmen, train dispatchers, telegraphers, conductors, switchmen, and all persons, associations, and combinations, voluntary or otherwise, whether in the service of the receivers or not, were enjoined—

From disabling, or rendering in any wise unfit for convenient and immediate use, any engine, cars, or other property of the receivers;

From interfering in any manner with the possession of locomotives, cars, or property of the receivers, or in their custody;

From interfering in any manner, by force, threats, or otherwise, with men who desire to continue in the service of the receivers, or with men employed by them to take the place of those who quit;

From interfering with or obstructing in any wise the operation of the railroad, or any portion thereof, or the running of engines or trains thereon as usual;

From any interference with the telegraph lines of the receivers along the lines of railways operated by them, or the operation thereof;

From combining and conspiring to quit, with or without notice, the service of said receivers, with the object and intent of crippling the property in their custody or embarrassing the operation of said railroad, and from so quitting the service of the said receivers, with or without notice, as to cripple the property or prevent or hinder the operation of said railroad; and, generally,

From interfering with the officers and agents of the receivers or their employés in any manner, by actual violence or by intimidation, threats, or otherwise, in the full and complete possession and management of the railroad and of all the property thereunto pertaining, and from interfering with any and all property in the custody of the receivers, whether belonging to them or to shippers or other owners, and from interfering with, intimidating, or otherwise

injuring or inconveniencing or delaying the passengers being transported or about to be transported over the railway of the receivers, or any portion thereof, or by interfering in any manner, by actual violence or threat, and otherwise preventing or endeavoring to prevent the shipment of freight or the transportation of the mails of the United States over the road operated by the receivers, until the further order of this court.

This injunction was based on a petition of the receivers, urging, in view of the general depression in the business of transportation, the necessity of reducing expenses, and representing to the court that many employés were threatening that if their compensation were diminished as indicated in a revised schedule of wages which the receivers had adopted, to take effect January 1, 1894, they would prevent or obstruct the operation of the railroads in the hands of the receivers. Upon the filing of the petition, and before the writ of injunction was issued, the court adjudged and decreed that the receivers—

"Be, and they are hereby, authorized and instructed to put in operation and maintain upon the Northern Pacific Railroad the revised schedule and rates, more specifically in said petition described, and ordered by said receivers to take effect January 1, A. D. 1894, and for that purpose, and to that end, their action in abrogating and revoking the schedules in force on said railroad at the time of their appointment as such receivers, August 15, 1893, is hereby confirmed."

A second writ of injunction was issued December 22, 1893. It was based on a supplemental petition of the receivers, and was in all respects like the former one, except that it contained, *in addition*, a clause by which the persons and associations to whom it was addressed were enjoined—

From combining or conspiring together, or with others, either jointly or severally, or as committees, or as officers of any so-called labor organization, with the design or purpose of causing a strike upon the lines of railroad operated by said receivers, *and from ordering, recommending, approving, or advising others to quit the service of the receivers of the Northern Pacific Railroad Company on January* 1, 1894, *or at any other time*, and from ordering, recommending, advising, or approving, by communication or instruction or otherwise, the employés of said receivers, or any of them, or of said Northern Pacific Railroad Company, to join in a strike on said January 1, 1894, or at any other time, and from ordering, recommending, or advising any committee or committees, or class or classes of employés of said receivers, to strike or join in a strike, on January 1, 1894, or at any other time, until the further order of this court.

The appellants, as chief executive officers, respectively, of the Brotherhood of Locomotive Engineers, the Order of Railway Conductors, the Brotherhood of Locomotive Firemen, the Order of Railway Telegraphers, the Brotherhood of Railway Trainmen, and the Switchmen's Mutual Aid Association, appeared in court on behalf of themselves and their respective organizations and associations, as well as on behalf of such employés of the receivers as were members of those associations and organizations, or of some of them,

and moved that the court modify the orders and injunctions of December 19, 1893, and December 22, 1893—

(1) By striking from both writs of injunction these words: "And from combining and conspiring to quit, with or without notice, the service of said receivers, with the object and intent of crippling the property in their custody or embarrassing the operation of said railroad, and from so quitting the service of said receivers, with or without notice, as to cripple the property or prevent or hinder the operation of said railroad."

(2) By striking from the writ of injunction of December 22, 1893, the above clause or paragraph relating specially to "strikes," which was not in the writ issued December 19, 1893.

The motion was in writing, and upon its face purported to be based on the petition and supplemental petition filed by the receivers, on the orders of the court made December 19 and 22, 1893, respectively, and on the above writs of injunction. Beyond the facts set out in those petitions, the only evidence adduced at the hearing of the motion was documentary in its nature, to wit, the constitutions and by-laws of the associations whose principal officers had been permitted to intervene in the cause.

The court, upon the hearing of the motion, modified the writ of injunction of December 22, 1893, by striking therefrom the above words in italics: "And from ordering, recommending, approving, or advising others to quit the service of the receivers of the Northern Pacific Railroad Company on January 1, 1894, or at any other time." The grounds upon which these words were stricken from the second writ of injunction are thus stated in the opinion of the court:

"In fairness this clause must be read in the light of the statements of the petition. It was therein asserted to the court that the men would not strike unless ordered so to do by the executive heads of the national labor organizations, and that the men would obey such orders, instead of following the direction of the court. The clause is specially directed to the chiefs of the several labor organizations. The use of the words 'order, recommend, approve, or advise' was to meet the various forms of expression under which, by the constitution or by-laws of these organizations, the command was cloaked, as, for instance, in one organization the chief head 'advises' a strike; in another, he 'approves' a strike; in another, he 'recommends' the quitting of employment. Whatever terms may be employed, the effect is the same. It is a command which may not be disregarded, under penalty of expulsion from the order and of social ostracism. This language was employed to fortify the restraints of the other portions of the writ, and to meet the various disguises under which the command is cloaked. It was so inserted out of abundant caution, that the meaning of the court might be clear; that there should be no unwarrantable interference with this property, no intimidation, no violence, no strike. It was perhaps unnecessary, being comprehended within the clause restraining the heads of these organizations from ordering, recommending, or advising a strike, or joinder in a strike.

"It is said, however, that the clause restrains an individual from friendly advice to the employés as a body, or individually, as to their or his best interest in respect of remaining in the service of the receivers. Read in the light of the petitions upon which the injunction was founded, I do not think that such construction can be indulged by any fair and impartial mind. It might be used as a text for a declamatory address to excite the passions and prejudices of men, but could not, I think, be susceptible of such strained construction by a judicial mind. The language of a writ of injunction should, however, be clear and explicit, and, if possible, above criticism as to its meaning. Since, therefore, the language of this particular phrase may be misconceived,

and the restraint intended is, in my judgment, comprehended within the other provisions of the writ, the motion in that respect will be granted, and the clause stricken from the writ."

Except in the particulars mentioned in the opinion of the circuit court, the motion to modify the injunctions was denied, and the injunctions continued in force. Of this action of the court the interveners complain.

In considering the important questions presented by the record, we have assumed, as did the circuit court, the truth of all the material facts set out in the petition and supplemental petition of the receivers. This is the necessary result of the interveners having based their motion on those petitions, and on the orders of the court directing writs of injunction to be issued. As those orders were based on the petitions of the receivers, it must be taken that the interveners, although insisting that the injunction should have been modified to the full extent indicated by their motion, concede, for the purposes of the motion, the facts to be as alleged in those petitions.

It is consequently to be regarded as undisputed in this cause that at the time the writ of December 19, 1893, was issued, some of the railroad employés were giving it out and threatening that if the revised schedules and rates in question were enforced they would suddenly quit the service of the receivers; by threats, force, and violence would compel other employés to quit such service, and by organized effort and intimidation prevent others from taking the places of those who might quit; would disable locomotives and cars so that they could not be safely used, or used only after expensive repairs; would take possession of the cars, engines, shops, and road-beds in the possession of the receivers, and otherwise prevent their being used; would so conduct themselves with regard to the property in the hands of the receivers as to hinder and embarrass them, their officers and agents, in its management and in the operation of trains; and that such dissatisfied employés, and others not in the employ of the receivers, but co-operating with those employés from a spirit of sympathy or mischief, would, unless restrained by the order of court, have carried out their threats, with the result that the receivers would not only have been compelled to abandon the revised schedules and rates proposed to be enforced, but would have been disabled from operating the railroads in their custody, from discharging their duties to the public as carriers of passengers and freight, and from transporting the mails of the United States, bringing thereby incalculable loss upon the trust property, as well as causing inconvenience and hardship to the public, particularly to the people in that part of the country traversed by the Northern Pacific Railroad, who were dependent upon the regular, continuous operation of that road for commercial facilities of every kind, as well as for fuel, provisions, and clothing.

It will be observed that the motion of the interveners does not question the power of the court to restrain acts upon the part of the employés or others which would have directly interfered with the receivers' possession of the trust property, or obstructed their control and management of it, as well as attempts, by force, intimidation, or threats, or otherwise, to molest or interfere with per-

sons who remained in the service of the receivers or with others who were willing to take the places of those withdrawing from such service.

But it was contended that the circuit court exceeded its powers when it enjoined the employés of the receivers "from combining and conspiring to quit, with or without notice, the service of said receivers, with the object and intent of crippling the property in their custody, or embarrassing the operation of said railroad, and from so quitting the service of said receivers, with or without notice, as to cripple the property, or prevent or hinder the operation of said railroad."

This clause embodies two distinct propositions,—one, relating to combinations and conspiracies to quit the service of the receivers with the object and intent of crippling the property or embarrassing the operation of the railroads in their charge; the other, having no reference to combinations and conspiracies to quit, or to the object and intent of any quitting, but only to employés "so quitting" as to cripple the property or prevent or hinder the operation of the railroad.

Considering these propositions in their inverse order, we remark that the injunction against employés so quitting as to cripple the property or prevent or hinder the operation of the railroad was equivalent to a command by the court that they should remain in the active employment of the receivers, and perform the services appropriate to their respective positions, until they could withdraw without crippling the property or preventing or hindering the operation of the railroad. The time when they could quit without violating the injunction is not otherwise indicated by the order of the court.

Under what circumstances may the employés of the receivers, of right, quit the service in which they are engaged? Much of the argument of counsel was directed to this question. We shall not attempt to lay down any general rule applicable to every case that may arise between employer and employés. If an employé quits without cause, and in violation of an express contract to serve for a stated time, then his quitting would not be of right, and he would be liable for any damages resulting from a breach of his agreement, and perhaps, in some states of case, to criminal prosecution for loss of life or limb by passengers or others, directly resulting from his abandoning his post at a time when care and watchfulness were required upon his part in the discharge of a duty he had undertaken to perform. And it may be assumed for the purposes of this discussion that he would be liable in like manner where the contract of service, by necessary implication arising out of the nature or the circumstances of the employment, required him not to quit the service of his employer suddenly, and without reasonable notice of his intention to do so.

But the vital question remains whether a court of equity will, under any circumstances, by injunction, prevent one individual from quitting the personal service of another? An affirmative answer to this question is not, we think, justified by any authority to which our attention has been called or of which we are aware. It would be an invasion of one's natural liberty to compel him to work for or

to remain in the personal service of another. One who is placed under such constraint is in a condition of involuntary servitude,— a condition which the supreme law of the land declares shall not exist within the United States, or in any place subject to their jurisdiction. Courts of equity have sometimes sought to sustain a contract for services requiring special knowledge or peculiar skill, by enjoining acts or conduct that would constitute a breach of such contract. To this class belong the cases of singers, actors, or musicians, who, after agreeing, for a valuable consideration, to give their professional service, at a named place and during a specified time, for the benefit of certain parties, refuse to meet their engagement, and undertake to appear during the same period for the benefit of other parties at another place. Lumley v. Wagner, 1 De Gex, M. & G. 604, 617; Id., 5 De Gex & S. 485, 16 Jur. 871; Montagne v. Flockton, L. R. 16 Eq. 189. While in such cases the singer, actor, or musician has been enjoined from appearing during the period named at a place and for parties different from those specified in his first engagement, it was never supposed that the court could by injunction compel the affirmative performance of the agreement to sing or to act or to play. In Powell Duffryn Steam-Coal Co. v. Taff Vale Ry. Co., 9 Ch. App. 331, 335, Lord Justice James observed that when what is required is not merely to restrain a party from doing an act of wrong, but to oblige him to do some continuous act involving labor and care, the court has never found its way to do this by injunction. In the same case Lord Justice Mellish stated the principle still more broadly, perhaps too broadly, when he said that a court can only order the doing of something which has to be done once for all, so that the court can see to its being done.

The rule, we think, is without exception that equity will not compel the actual, affirmative performance by an employé of merely personal services, any more than it will compel an employer to retain in his personal service one who, no matter for what cause, is not acceptable to him for service of that character. The right of an employé engaged to perform personal service to quit that service rests upon the same basis as the right of his employer to discharge him from further personal service. If the quitting in the one case or the discharging in the other is in violation of the contract between the parties, the one injured by the breach has his action for damages; and a court of equity will not, indirectly or negatively, by means of an injunction restraining the violation of the contract, compel the affirmative performance from day to day or the affirmative acceptance of merely personal services. Relief of that character has always been regarded as impracticable. Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 730, 740, Taft, J., and authorities cited; Fry, Spec. Perf. (3d Am. Ed.) §§ 87–91, and authorities cited.

It is supposed that these principles are inapplicable or should not be applied in the case of employés of a railroad company, which, under legislative sanction, constructs and maintains a public highway primarily for the convenience of the people, and in the regular operation of which the public are vitally interested. Undoubtedly

the simultaneous cessation of work by any considerable number of the employés of a railroad corporation, without previous notice, will have an injurious effect, and for a time inconvenience the public. But these evils, great as they are, and although arising in many cases from the inconsiderate conduct of employés and employers, both equally indifferent to the general welfare, are to be met and remedied by legislation restraining alike employés and employers so far as necessary adequately to guard the rights of the public as involved in the existence, maintenance and safe management of public highways. In the absence of legislation to the contrary, the right of one in the service of a quasi public corporation to withdraw therefrom at such time as he sees fit, and the right of the managers of such a corporation to discharge an employé from service whenever they see fit, must be deemed so far absolute that no court of equity will compel him, against his will, to remain in such service, or actually to perform the personal acts required in such employments, or compel such managers, against their will, to keep a particular employé in their service. It was competent for the receivers in this case, subject to the approval of the court, to adopt a schedule of wages or salaries, and say to employés, "We will pay according to this schedule, and if you are not willing to accept such wages you will be discharged." It was competent for an employé to say, "I will not remain in your service under that schedule, and if it is to be enforced I will withdraw, leaving you to manage the property as best you may without my assistance." In the one case, the exercise by the receivers of their right to adopt a new schedule of wages could not, at least in the case of a general employment without limit as to time, be made to depend upon considerations of hardship and inconvenience to employés. In the other, the exercise by employés of their right to quit in consequence of a proposed reduction of wages could not be made to depend upon considerations of hardship or inconvenience to those interested in the trust property or to the public. The fact that employés of railroads may quit under circumstances that would show bad faith upon their part, or a reckless disregard of their contract or of the convenience and interests of both employer and the public, does not justify a departure from the general rule that equity will not compel the actual, affirmative performance of merely personal services, or (which is the same thing) require employés, against their will, to remain in the personal service of their employer.

The result of these views is that the court below should have eliminated from the writ of injunction the words, "and from so quitting the service of the said receivers, with or without notice, as to cripple the property or prevent or hinder the operation of said railroad."

But different considerations must control in respect to the words in the same paragraph of the writs of injunction, "and from combining and conspiring to quit, with or without notice, the service of said receivers, with the object and intent of crippling the property in their custody, or embarrassing the operation of said railroad." We have said that, if employés were unwilling to re-

main in the service of the receivers for the compensation prescribed for them by the revised schedules, it was the right of each one on that account to withdraw from such service. It was equally their right, without reference to the effect upon the property or upon the operation of the road, to confer with each other upon the subject of the proposed reduction in wages, and to withdraw in a body from the service of the receivers because of the proposed change. Indeed, their right, as a body of employés affected by the proposed reduction of wages, to demand given rates of compensation as a condition of their remaining in the service, was as absolute and perfect as was the right of the receivers representing the aggregation of persons, creditors, and stockholders interested in the trust property, and the general public, to fix the rates they were willing to pay their respective employés. But that is a very different matter from a *combination* and *conspiracy* among employes, with the *object and intent,* not simply of quitting the service of the receivers because of the reduction of wages, but of *crippling the property* in their hands, and *embarrassing the operation* of the railroad. When the order for the original injunction was applied for it was represented—and the interveners admit by their motion that it was correctly represented—that unless the restraining power of the court was exerted the dissatisfied employés, and others co-operating with them, would physically disable and render unfit for use the cars and other property in the possession of the receivers, and by force, threats, and intimidation used against employés remaining in their service, and against those desiring to take the places of those quitting, would prevent the receivers from operating the roads in their custody, and from discharging the duties which they owed on behalf of the corporation to the parties interested in the trust property, to the government, and to the public.

The general inhibition against combinations and conspiracies formed with the object and intent of crippling the property and embarrassing the operation of the railroad must be construed as referring only to acts of violence, intimidation, and wrong of the same nature or class as those specifically described in the previous clauses of the writ. We do not interpret the words last above quoted as embracing the case of employés who, being dissatisfied with the proposed reduction of their wages, merely withdraw on that account, singly or by concerted action, from the service of the receivers, using neither force, threats, persecution, nor intimidation towards employés who do not join them, nor any device to molest, hinder, alarm, or interfere with others who take or desire to take their places. We use the word "device" here as applicable to cases like that of Sherry v. Perkins, 147 Mass. 212,[1] in which it appeared that parties belonging to a labor organization displayed and maintained certain banners in front of the plaintiff's place of business for the purpose of deterring workmen from remaining in or entering his service. As the acts complained of were injurious to the

[1] 17 N. E. 307.

plaintiff's business and were a nuisance, it was held that they could be reached and restrained by injunction. So in Spinning Co. v. Riley, L. R. 6 Eq. 551, equity interfered by injunction to restrain the conduct of parties, officers of a trades union, who gave notice to workmen, by means of placards and advertisements, that they were not to hire themselves to the plaintiff pending a dispute between the union and the plaintiff. See, also, U. S. v. Kane, 23 Fed. 748; Emack v. Kane, 34 Fed. 46; Casey v. Typographical Union, 45 Fed. 135; Walker v. Cronin, 107 Mass. 555.

These employés having taken service first with the company, and afterwards with the receivers, under a general contract of employment, which did not limit the exercise of the right to quit the service, their peaceable co-operation as the result of friendly argument, persuasion, or conference among themselves, in asserting the right of each and all to refuse further service under a schedule of reduced wages, would not have been illegal or criminal, although they may have so acted in the firm belief and expectation that a simultaneous quitting without notice would temporarily inconvenience the receivers and the public. If, in good faith and peaceably, they exercise their right of quitting the service, intending thereby only to better their condition by securing such wages as they deem just, but not to injure or interfere with the free action of others, they cannot be legally charged with any loss to the trust property resulting from their cessation of work in consequence of the refusal of the receivers to accede to the terms upon which they were willing to remain in the service. Such a loss, under the circumstances stated, would be incidental to the situation, and could not be attributed to employés exercising lawful rights in orderly ways, or to the receivers, when, in good faith and in fidelity to their trust, they declare a reduction of wages, and thereby cause dissatisfaction among employés, and their withdrawal from service.

The combinations or conspiracies which the law does not tolerate are of a different character. According to the principles of the common law, a conspiracy upon the part of two or more persons, *with the intent*, by their combined power, to wrong others, or to prejudice the rights of the public, is in itself illegal, although nothing be actually done in execution of such conspiracy. This is fundamental in our jurisprudence. So a combination or conspiracy to procure an employé or body of employés to quit service in violation of the contract of service would be unlawful, and in a proper case might be enjoined, if the injury threatened would be irremediable at law. It is one thing for a single individual, or for several individuals each acting upon his own responsibility and not in co-operation with others, to form the purpose of inflicting actual injury upon the property or rights of others. It is quite a different thing, in the eye of the law, for many persons to combine or conspire together with the intent, not simply of asserting their rights or of accomplishing lawful ends by peaceable methods, but of employing their united energies to injure others or the public.

An intent upon the part of a single person to injure the rights of others or of the public is not in itself a wrong of which the law will take cognizance, unless some injurious act be done in execution of the unlawful intent. But a combination of two or more persons with such an intent, and under circumstances that give them, when so combined, a power to do an injury they would not possess as individuals acting singly, has always been recognized as in itself wrongful and illegal.

The general principle is illustrated in Callan v. Wilson, 127 U. S. 540, 555, 8 Sup. Ct. 1301. That was an information in the police court of the District of Columbia charging the defendants Callan and others with a conspiracy to prevent certain named persons, who had been expelled from a local association, a branch of a larger one known as the Knights of Labor of America, from pursuing their calling of musicians anywhere in the United States. This result, the information charged, was to be effected by the defendants refusing to work as musicians, or in any other capacity, with the persons so named, or with or for any person, firm, or corporation working with or employing them; by procuring all other members of those organizations, and all other workmen and tradesmen, not to work in any capacity with or for them or either of them, or for any firm or corporation that employed either of them; and by warning and threatening every person, firm, or corporation employing such obnoxious persons that, if they did not forthwith cease to employ and refuse to employ them, they should not receive the custom or patronage either of the persons so conspiring, or of other members of said organizations. The question in the case was whether the accused were entitled to a trial by jury or whether the offense charged was of the class called "petty," for the trial of which a defendant could not at common law claim, of right, a jury. The court held that the offense charged was not a petty or trivial one, but one of a grave character, affecting the public at large, and for the trial of which a jury was therefore demandable as of right.

Among the authorities cited in that case were Com. v. Hunt, 4 Metc. (Mass.) 111, 121, in which it was said that "the general rule of the common law is that it is a criminal and indictable offense for two or more to confederate and combine together, by concerted means, to do that which is unlawful or criminal, to the injury of the public, or portions or classes of the community, or even to the rights of an individual;" State v. Burnham, 15 N. H. 396, 401, where it was held that "combinations against law or against individuals are always dangerous to the public peace and to public security; to guard against the union of individuals to effect an unlawful design is not easy, and to detect and punish them is often extremely difficult;" and Reg. v. Parnell, 14 Cox, Cr. Cas. 508, 514, where the court observed, that "an agreement to effect an injury or wrong to another by two or more persons is constituted an offense, because the wrong to be effected by a combination assumes a formidable character; when done by one alone it is but a

civil injury, but it assumes a formidable or aggravated character when it is to be effected by the powers of a combination."

One of the cases cited in Callan v. Wilson is Com. v. Carlisle, Brightly, N. P. 36, 39, 40, in which Mr. Justice Gibson considered the law of conspiracy with care, and among other things said:

"There is between the different parts of the body politic a reciprocity of action on each other, which, like the action of antagonizing muscles in the natural body, not only prescribes to each its appropriate state and action, but regulates the motion of the whole. The effort of an individual to disturb this equilibrium can never be perceptible, nor carry the operation of his interest or that of any other individual beyond the limits of fair competition. But, the increase of power by combination of means being in geometrical proportion to the number concerned, an association may be able to give an impulse, not only oppressive to individuals, but mischievous to the public at large; and it is the employment of an engine so powerful and dangerous that gives criminality to an act that would be perfectly inno cent, at least in a legal view, when done by an individual."

There are many other adjudged cases to the same effect. In State v. Stewart, 59 Vt. 273, 286, 9 Atl. 559, it was held, after an extended review of the authorities, that:

"A combination of two or more persons to effect an illegal purpose, either by legal or illegal means. whether such purpose be illegal at common law or by statute, or to effect a legal purpose by illegal means, whether such means be illegal at common law or by statute, is a common-law conspiracy. Such combinations are equally illegal whether they promote objects or adopt means that are per se indictable, or promote objects or adopt means that are per se oppressive, immoral, or wrongfully prejudicial to the rights of others. If they seek to restrain trade, or tend to the destruction of the material property of the country, they work injury to the whole people."

In State v. Buchanan, 5 Har. & J. 317, 352, 355, the court of appeals of Maryland adjudged that:

"Every conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent. malicious, or corrupt purpose, or for a purpose which has a tendency to prejudice the public in general, is at common law an indict-able offense, though nothing be done in execution of it, and no matter by what means the conspiracy was intended to be effected, which may be perfectly indifferent, and makes no ingredient of the crime, and therefore need not be stated in the indictment."

Again:

"There is nothing in the objection that to punish a conspiracy where the end is not accomplished would be to punish a mere unexecuted intention. It is not the bare intention that the law punishes, but the *act of conspiring*, which is made a substantive offense by the nature of the object to be effected."

In State v. Glidden, 55 Conn. 46, 75, 8 Atl. 890, the court said:

"Any one man, or any one of several men acting independently, is powerless; but when several combine, and direct their united energies to the accomplishment of a bad purpose, the combination is formidable. Its power for evil increases as its number increases. * * * The combination becomes dangerous, and subversive of the rights of others, and the law wisely says that it is a crime."

In Queen v. Kenrick, 5 Q. B. 49, Chief Justice Denman said that by the law of conspiracy, as it had been administered for at least the previous hundred years, any combination to prejudice another

unlawfully was considered as constituting the offense, and that the offense consisted in the conspiracy, and not in the acts committed for carrying it into effect.

See, also, Carew v. Rutherford, 106 Mass. 1, 13; Steamship Co. v. McKenna, 30 Fed. 48; Coeur d'Alene C. & M. Co. v. Miners' Union, 51 Fed. 260, 267; 3 Whart. Cr. Law (8th Ed.) § 1337 et seq.; 2 Archb. Cr. Pr. & Pl. (Pom. Ed.) 1830, note; 2 Bish. Cr. Law, § 180 et seq.

It seems entirely clear, upon authority, that any combination or conspiracy upon the part of these employés would be illegal, which has for its object to cripple the property in the hands of the receivers, and to embarrass the operation of the railroads under their management, either by disabling or rendering unfit for use engines, cars, or other property in their hands, or by interfering with their possession, or by actually obstructing their control and management of the property, or by using force, intimidation, threats, or other wrongful methods against the receivers or their agents, or against employés remaining in their service, or by using like methods to cause employés to quit or prevent or deter others from entering the service in place of those leaving it. Combinations of that character disturb the peace of society, and are mischievous in the extreme. They imperil the interests of the public, which may rightfully demand that the free course of trade shall not be unreasonably obstructed. They endanger the personal security and the personal liberty of individuals who, in the exercise of their inalienable privilege of choosing the terms upon which they shall labor, enter or attempt to enter the service of those against whom such combinations are specially aimed. And as acts of the character referred to would have defeated a proper administration of the trust estate, and inflicted irreparable injury upon it, as well as prejudiced the rights of the public, the circuit court properly framed its injunction so as to restrain all such acts as are specifically mentioned, as well as combinations and conspiracies having the object and intent of physically injuring the property, or of actually interfering with the regular, continuous operation of the railroad by the receivers.

Some reference was made in argument to the act of congress of June 29, 1886, legalizing the incorporation of national trades unions. 24 Stat. 86, c. 567. It is not perceived that this reference is at all pertinent to the present discussion. That act does not in any degree sanction illegal combinations. It recognizes the legal character of any association of working people having two or more branches in the states or territories of the United States, and established "for the purpose of aiding its members to become more skillful and efficient workers, the promotion of their general intelligence, the elevation of their character, the regulation of their wages and their hours and conditions of labor, the protection of their individual rights in the prosecution of their trade or trades, the raising of funds for the benefit of the sick, disabled, or unemployed members or the families of deceased members, or for such other object or objects for which working people may unlawfully combine, having in view their mutual protection or benefit." As-

sociations of that character are authorized to make and establish such constitutions, rules, and by-laws as they deem proper to carry out their lawful objects. Those objects, as defined by congress, are most praiseworthy, and should be sustained by the courts whenever their power to that end is properly invoked. What we have said about illegal combinations has no reference to such associations, but only to combinations formed with the intent to employ force, intimidation, threats, or other wrongful methods whereby the public will be injured, or whereby will be impaired the absolute right of individuals, whether belonging to such combinations or not, to dispose of their labor or property upon such terms as to them seem best.

The principle that a combination or conspiracy of two or more persons to injure the rights of others is illegal, although nothing may have been done in execution of that intent, has been embodied in the statutes of Wisconsin, in which state the present cause is pending. By an act passed April 2, 1887, it was declared that:

"Any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession, by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be punishable by imprisonment in the county jail not more than one year, or by fine not exceeding five hundred dollars."

And by a subsequent act, passed April 8, 1887, it was declared that:

"Any two or more employers who shall agree, combine, and confederate together for the purpose of interfering with or preventing any person or persons seeking employment, either by threats, promises, or by circulating or causing the circulation of a so-called black list, or by any means whatsoever, or for the purpose of procuring and causing the discharge of any employé or employés, by any means whatsoever, shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by imprisonment in the county jail for a period of not more than one year, or by a fine of not less than fifty dollars, or by both." 1 Laws Wis. 1887, pp. 299, 380, cc. 287, 349; 2 Sanb. & B. St. Wis. §§ 4466a, 4466b.

This legislation was followed by an act published May 3, 1887, providing:

"Section 1. Any person who by threats, intimidation, force or coercion of any kind shall hinder or prevent any other person from engaging in or continuing in any lawful work or employment, either for himself or as a wage-worker, or who shall attempt to so hinder or prevent, shall be punished by fine not exceeding one hundred dollars or by imprisonment in the county jail not more than six months, or by both fine and imprisonment in the discretion of the court.

"Sec. 2. Any person who shall individually or in association with one or more others, wilfully break, injure or remove any part or parts of any railway car or locomotive, or any other portable vehicle or traction engine, or any part or parts of any stationary engine, machine, implement or machinery, for the purpose of destroying such locomotive, engines, car, vehicle, implement or machinery, or of preventing the useful operation thereof, or who shall in any other way wilfully or maliciously interfere with or prevent the

.running or operation of any locomotive, engine or machinery, shall be punished by fine not exceeding one thousand dollars or by imprisonment in the county jail or the state prison not exceeding two years, or by both fine and imprisonment in the discretion of the court." 1 Laws Wis. p. 462, c. 427.

It thus appears that combinations and conspiracies by two or more persons, with the intent to injure the rights of others were illegal at common law, and are public offenses in the state where this cause is pending.

For the reasons stated, we are of opinion that the circuit court properly refused to strike from the writs of injunction the words, "And from combining and conspiring to quit with or without notice the service of said receivers, with the object and intent of crippling the property in their custody or embarrassing the operation of said railroad."

We come next to that clause in the writ of injunction of December 22, 1893, expressly relating to strikes.

What is to be deemed a strike, within the meaning of the order of the circuit court? In the opinion of the circuit judge, made a part of the record, we are informed that at the argument below the definition proffered to the court by the interveners as one recog-nized by the labor organizations of the country was as follows:

"A strike is a concerted cessation of or refusal to work until or unless certain conditions which obtain or are incident to the terms of employment are changed. The employé declines to longer work, knowing full well that the employer may immediately employ another to fill his place, also knowing that he may or may not be re-employed or returned to service. The employer has the option of acceding to the demand and returning the old employé to service, of employing new men, or of forcing conditions under which the old men are glad to return to service under the old conditions."

The learned circuit judge said that a more exact definition of a strike was "a combined effort among workmen to compel the master to the concession of a certain demand by preventing the conduct of his business until compliance with the demand," and he said:

"It is idle to talk of a peaceful strike. None such ever occurred. The suggestion is an impeachment of intelligence. All combinations to interfere with perfect freedom in the proper management of one's lawful business, to dictate the terms upon which such business shall be conducted, by means of threats or by interference with property or traffic, or with the lawful employment of others, are within the condemnation of the law. It has been well said that the wit of man could not devise a legal strike, because compulsion is the leading idea of it. A strike is essentially a conspiracy to extort by violence; the means employed to effect the end being not only the cessation of labor by the conspirators, but by the necessary prevention of labor by those who are willing to assume their places, and as a last resort, and in many instances an essential element of success, the disabling and destruction of the property of the master; and so, by intimidation and by the compulsion of force, to accomplish the end designed."

Under this view of the nature and object of strikes the injunction was directed, generally, against combinations and conspiracies upon the part of employés with the design or purpose of causing a strike on the lines of railroad operated by the receivers; against the ordering, recommending, advising, or approving the employés

to join in a strike; and against the ordering, recommending, or advising any committee or class of employés to strike, or to join in a strike.

If the word "strike" means in law what the circuit court held it to mean, the order of injunction, so far as it relates to strikes, is not liable to objection as being in excess of the power of a court of equity. Indeed, upon the facts presented by the receivers and admitted by the motion of the interveners, it was made the duty of the court to exert its utmost authority to protect both the property in its charge and the interests of the public against all strikes of the character described in the opinion of the circuit judge.

But in our judgment the injunction was not sufficiently specific in respect to strikes. We are not prepared, in the absence of evidence, to hold, as matter of law, that a combination among employés, having for its object their orderly withdrawal in large numbers or in a body from the service of their employers, on account simply of a reduction in their wages, is not a "strike," within the meaning of the word as commonly used. Such a withdrawal, although amounting to a strike, is not, as we have already said, either illegal or criminal. In Farrer v. Close, L. R. 4 Q. B. 602, 612, Sir James Hannen, afterwards lord of appeal in ordinary, said:

"I am, however, of opinion that strikes are not necessarily illegal. A 'strike' is properly defined as 'a simultaneous cessation of work on the part of the workmen;' and its legality or illegality must depend on the means by which it is enforced, and on its objects. It may be criminal, as if it be a part of a combination for the purpose of injuring or molesting either masters or men; or it may be simply illegal, as if it be the result of an agreement depriving those engaged in it of their liberty of action, similar to that by which the employers bound themselves in the case of Hilton v. Eckersley, 6 El. & Bl. 47, 66; or it may be perfectly innocent, as if it be the result of the voluntary combination of the men for the purpose only of benefiting themselves by raising their wages, or for the purpose of compelling the fulfillment of an engagement entered into between employers and employés, or any other lawful purpose."

In our opinion the order should describe more distinctly than it does the strikes which the injunction was intended to restrain. That employés and their associates may not unwittingly place themselves in antagonism to the court's authority, and become subject to fine and imprisonment as for contempt, the order should indicate more clearly than has been done that the strikes intended to be restrained were those designed to physically cripple the trust property, or to actually obstruct the receivers in the operation of the road, or to interfere with their employés who do not wish to quit, or to prevent, by intimidation or other wrongful modes, or by any device, the employment of others to take the places of those quitting, and not such as were the result of the exercise by employés, in peaceable ways, of rights clearly belonging to them, and were not designed to embarrass or injure others, or to interfere with the actual possession and management of the property by the receivers.

In our consideration of this case we have not overlooked the observations of counsel in respect to the use of special injunctions to prevent wrongs which, if committed, may be otherwise reached by

the courts. It is quite true that this part of the jurisdiction of a court of equity should be exercised with extreme caution, and only in clear cases. Brown v. Newall, 2 Mylne & C. 558, 570. Mr. Justice Baldwin, in Bonaparte v. Railroad Co., Baldw. 205, 217, Fed. Cas. No. 1,617, properly said:

"There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or is more dangerous in a doubtful case, than the issuing an injunction. It is the strong arm of equity, that never ought to be extended, unless in cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction; but that will not be awarded in doubtful cases, or new ones not coming within well-established principles, for if it issues erroneously an irreparable injury is inflicted, for which there can be no redress, it being the act of a court, not of the party who prays for it. It will be refused till the court are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done by an illegal act. In such a case the court owes it to its own suitors and its own principles to administer the only remedy the law allows to prevent the commission of the act."

The authorities all agree that a court of equity should not hesitate to use this power when the circumstances of the particular case in hand require it to be done in order to protect rights of property against irreparable damage by wrongdoers. It is, Justice Story said, because of the varying circumstances of cases, "that courts of equity constantly decline to lay down any rule which shall limit their power and discretion as to the particular cases in which such injunctions shall be granted or withheld." "And," the author proceeds, "there is wisdom in this course, for it is impossible to foresee all the exigencies of society which may require their aid and assistance to protect rights or redress wrongs. The jurisdiction of these courts, thus operating by special injunction, is manifestly indispensable for the purposes of social justice in a great variety of cases, and therefore should be fostered and upheld by a steady confidence." Story, Eq. Jur. § 959b.

In using a special injunction to protect the property in the custody of the receivers against threatened acts which it is admitted would, if not restrained, have been committed, and would have inflicted irreparable loss upon that property, and seriously prejudiced the interests of the public, as involved in the regular, continuous operation of the Northern Pacific Railroad, the circuit court, except in the particulars indicated, did not restrain any act which, upon the facts admitted by the motion, it was not its plain duty to restrain. No other remedy was full, adequate, and complete for the protection of the trust property, and for the preservation of the rights of individual suitors and of the public in its due and orderly administration by the court's receivers. "It is not enough," the court said in Boyce's Ex'rs v. Grundy, 3 Pet. 210, "that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration, as the remedy in equity." And the application of the rule that equity will not interfere where there is an adequate

remedy at law must depend upon the circumstances of each case as it arises. Watson v. Sutherland, 5 Wall. 74, 79. That some of the acts enjoined would have been criminal, subjecting the wrongdoers to actions for damages or to criminal prosecution, does not therefore in itself determine the question as to interference by injunction. If the acts stopped at crime, or involved merely crime, or if the injury threatened could, if done, be adequately compensated in damages, equity would not interfere. But as the acts threatened involved irreparable injury to and destruction of property for all the purposes for which that property was adapted, as well as continuous acts of trespass, to say nothing of the rights of the public, the remedy at law would have been inadequate. "Formerly," Mr. Justice Story says, "courts of equity were extremely reluctant to interfere at all, even in regard to cases of repeated trespasses. But now there is not the slightest hesitation, if the acts done, or threatened to be done, to the property would be ruinous or irreparable, or would impair the just enjoyment of the property in future. If, indeed, courts of equity did not interfere in cases of this sort, there would, as has been truly said, be a great failure of justice in this country." 2 Story, Eq. Jur. § 928. So, in respect to acts which constitute a nuisance injurious to property, if "the injury is of so material a nature that it cannot be well or fully compensated by the recovery of damages, or be such as from its continuance and permanent mischief might occasion a constantly recurring grievance, a foundation is laid for the interference of the court by way of injunction." Kerr, Inj. 166, c. 6, and authorities there cited. This jurisdiction, the author says, was formerly exercised sparingly and with caution, "but it is now fully established, and will be exercised as freely as in other cases in which the aid of the court is sought for the purpose of protecting legal rights from violation."

In the course of the argument some reference was made to the act of congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies." 26 Stat. 209. It is not necessary in this case to decide whether, within the meaning of that statute, the acts and combinations against which the injunction was aimed would have been in restraint of trade or commerce among the several states. This case was not based upon that act. The questions now before the court have been determined without reference to the above act, and upon the general principles that control the exercise of jurisdiction by courts of equity.

For the reasons we have stated the order complained of is reversed in part, and the cause is remanded with directions to sustain the motion to strike out and modify the injunction to the extent indicated in this opinion.

Reversed.