# CHARLESTON.

Transportation Co. *v.* Standard Oil Company.

Submitted November 2, 1901.    Decided January 28, 1902.

| 50 | 611 |
| 54 | 130 |
| 50 | 611 |
| 58 | 480 |
| 50 | 611 |
| f 59 | 254 |
| 59 | 259 |
| 60 | 41 |
| 50 | 611 |
| 63 | 506 |

1. Corporations—*Torts—Damages.*
    Corporations can be held liable for torts. They can be held liable for damages for torts done in pursuance of conspiracy and combination between them and other corporations or persons, just like natural persons. (p. 613).

2. Competition—*Patronage—Contract.*
    One may, without liability, in furtherance of his own interest in the competition of business, establish any works competing

with another, and may induce customers of that other to withdraw their patronage from him, in order to obtain business for himself, though it injure, and is intended to injure that other person's business, if there is no contract between such person and his customers. The motive of the person so doing, though malicious, is not material, his acts being lawful. But if he induce such withdrawal of custom, not in *bona fide* neighborly advice, nor in free right of competition to benefit his own business, but wantonly only to injure that other person, he is liable to action. What one may do thus, several with same justification may combine to do. (p. 615).

3. CONSPIRACY—*Not Unlawful—Injury.*

Where several combine and agree to do a lawful act, violative of no duty to another due from them, it is not an unlawful conspiracy subjecting them to an action by him, though the act injure him, and was so intended. (p. 615).

4. MALICIOUSNESS—*Violation of Contract—Actionable.*

If one wantonly and maliciously, whether for his own benefit or not, induce a person to violate his contract with a third person to the injury of that third person, it is actionable. (p. 616).

5. CAUSE OF ACTION—*Pleading—Bill of Particulars.*

The cause of action or ground of defense must be given in the pleadings, not in bills of particulars; but where the pleading is allowably, under the law of pleading, general, so as not to fairly apprise the adverse party of what he has to meet, a bill of particulars may be demanded to amplify the pleading, so as to more minutely specify the claim or defense, and to prevent surprise on the trial; but no call for a bill of particulars of evidence can be made. (p. 623).

Error to Circuit Court, Wood County.

Action by Transportation Company against Standard Oil Company. Judgment for defendants and plaintiff brings error.

*Reversed.*

VAN WINKLER & AMBLER, W. N. MILLER and MASON G. AMBLER, for plaintiff in error.

V. B. ARCHER, M. F. ELLIOTT and A. B. FLEMING, for defendants in error.

BRANNON, JUDGE:

The West Virginia Transportation Company brought trespass on the case in Wood County against the Standard Oil Company and the Eureka Pipe Line Company, all corporations, and

upon demurrer to the declaration judgment was rendered for the defendants. The first count of the declaration charges that the plaintiff was engaged in the business of transporting petroleum oils by means of pipe lines and tank cars from Volcano and vicinity to Parkersburg, and in storing oil, and had expended three hundred thousand dollars in acquiring land, rights of way, lines of tubing and other things necessary in its business, and had built up a large and lucrative business, and that the defendants maliciously and wickedly contriving and intending to injure the plaintiff and ruin its business, and render its plant and property worthless and deprive it of all its business, did confederate and conspire together and with the West Virginia Oil Company, another corporaton, and with C. H. Shattuck and other persons unknown to the plaintiff, and to prevent all persons producing, refining, selling or transporting oils, and particularly to prevent the plaintiff from transporting oils through its pipe lines and by means of its tank cars, and from storing oil in its storage tanks, and from executing any lawful trade in connection therewith. And it charged also that the Standard Oil Company of New Jersey, organized about 1891, and was the successor of all corporations and firms prior to that date associated together under a contract known as the Standard Oil Trust; that the Camden Consolidated Oil Company was a member of the said trust and under its control; that in 1892 the business and property of said trust were reorganized under, and are now controlled by the Standard Oil Company, and controlled by the same men formerly owning and controlling said Standard Oil Trust; that the Eureka Pipe Line Company is owned, controlled and operated by the same men, and doing business in the interest of the Standard Oil Company, and is a transportation branch of that company; that the West Virginia Oil Company was organized about 1885 to purchase and operate what was known as the property of the West Virginia Oil and Land Company, a territory on which the plaintiff had laid pipe lines, and from which it had for several years transported oil for compensation; that the Standard Oil Trust, through individuals interested in it, had become large stockholders in the West Virginia Oil Company, and dictated its management, and by means thereof, and of its monopoly of the production, refining and transportation of oil through out the world practically controlled the business of said West Virginia Oil Company, and

since the reorganization of the Standard Oil Trust by the organization of the Standard Oil Company had continued to do so, and had induced the construction of the Eureka Pipe Line Company, and thus ruined the business of the plaintiff; that this was the object and accomplishment of the said combination and malicious conspiracy.

It is very clear that a corporation can be guilty of a combination or conspiracy with other corporations or persons aimed at and accomplishing the injury of other corporations or persons. It·is a mere legal entity, impersonal, and in itself is incapable of so doing; but it is moved by human beings, is operated by human agents, and is thus an active person, not only for damage done in the breach of contracts, but for torts doing others harm. It will not avail either to say' that it has no power within the scope of its authority to do wrong, and can do only the lawful things contemplated by the state in the bestowal of its charter, and that therefore so far as its agents make it do wrong, its acts are outside the field of its legal power, *ultra vires* and void, not binding the corporation, and thus that no tort binds it. Such was the old common law rule, but it is completely overruled. 7 Am. & Eng. Ency. L. (2d Ed.) 824. That doctrine may do as to contracts; but it cannot plead this doctrine to screen itself from its wrongs done to others against their will and rights. *National Bank* v. *Graham,* 100 U. S. 699. In that case the court says: "They are also liable for acts of their servants while engaged in the business of their principals, to the same extent that individuals are liable under like circumstances. *Merchants Bank* v. *State Bank,* 10 Wall. 604. An action may be maintained against its malicious or negligent torts, however foreign they may be to the object of its creaton, or beyond its granted powers. It may be sued for assault and battery, for fraud and deceit, for false imprisonment, for malicious prosecution, for nuisance, for libel. In certain cases, it may be indicted for misfeasance or non-feasance touching duties imposed upon it in which the public are interested. Its offenses may be such as will forfeit its existence. *P. W. & B. R. R.* v. *Quigley,* 21 How. 209; 2 Wait. Act. & Def.. 337-39; Ang. & Ames, Corp, ss. 186, 385; Cooley, Torts 119, 120." Manifestly society must have protection against wrongful acts done by these corporate persons, now so numerous and performing so many varied business functions in our day, which so closely touch man in all his affairs. The case of

*The State* v. *B. & O. R. R. Co.,* 15 W. Va. 362, strongly asserts
this liability.   So, *Smith* v. *N. & W. R. R. Co.,* (this term) ;
*Gillingham* v. *Company,* 35 W. Va. 588; *Gregory* v. *R. R. Co.,*
37 *Id.* 306.   "Upon like grounds, an action may be maintained
against a corporation to recover damages caused by a conspiracy
to which the corporation was a party."   5 Thomp. Corp., s. 6315 ;
*Buffalo Co.* v. *Standard Oil Co.,* 106 N. Y. —.   If a corporation
have no soul, it has a mind, and can commit a tort involving a
mental element.   It can, therefore, have a bad, malicious mo-
tive through its representative agents acting in its transactions.
7 Am. & Eng. Ency. L. (2d Ed.) 830.

That a monopoly, a huge corporation, or associate corpora-
tions, to establish vast business and derive profits therefrom, to
the great detriment, the practical ruin of the plaintiff and others
in like business is charged in the first count; but that is not
enough.   It must appear that this monopolistic business hurt
the plaintiff ; but that even will not do ; it must harm it by doing
unlawful things.   Not only must the plaintiff have a right, but
that right must be injured by the defendants, and injured too by
unlawful means, by acts which the defendants had no right to do.
You must establsh that the defendants owed a duty to the plain-
tiff, and broke that duty to make an actionable tort.   There can
be no tort, unless there is a duty from one to another, and that
duty broken.   You must set this down as a test of tort.   "A legal
right must be invaded in order that an action of tort may be
maintained.   The mere fact that a complainant may have suf-
fered damage of the kind which the law recognizes is not enough.
There must also be a violation of a duty recognized by law:   In
the language of the civil law mere *damnum* is not enough; there
must also be *injuria; that is, ex damno absqe injuria non oritur
actio.*"   1 Jag., Torts 87.   We must nicely distinguish between
*damnum* and *injuria.*   We commonly use the words "injury"
and "damage" indiscriminately ; but in the rule above these
Latin words are distinct.   *Damnum* means only harm, hurt, loss,
damage ; while *injuria* comes from *in,* against, and *jus,* right,
and means something done against the right of the party, pro-
ducing damage, and has no reference to the fact or amount of
damage.   Unless a right is violated though there be damage, it is
*damnum absque injuria.*   Such is the case under the first count
of the declaration.   The plaintiff had a perfect right to operate
its business.   So had the defendants the right to operate theirs.

They both had right to compete for business. There is no right better established under the law of business than the right of trade competition. *Mogul S. S. Co.* v. *McGregor,* 21 Q. B. Div. 544, 23 *Id.* 598; *Hutly* v. *Simmons,* 1 (1898) 2 B. D. Div. 181. These companies were owned by the same men. Their interests were common, one buying, refining and selling oil, the other transporting it. I mean the defendant companies. Had they not a right to work together to promote the common interest? Even to conspire to draw to themselves from other competitors business, so they did no unlawful act? The count charges an arrangement designed to form a monopoly to control or dominate the business of purchasing, producing, refining and selling oil. Every one has a right to enlarge his business, even though by means of greater capital, superior facilities and capacity he monopolize business and injure competitors. If the business is lawful, so that it violate no state law, even if it overshadow others, who can prevent it in a free country of constitutional law? The constitutions of the state and union say that there shall be liberty. This includes the right to carry on legitimate business, as much as the right to be exempt from illegal imprisonment of body. *State* v. *Goodwill,* 33 W. Va. 179, 181; 25 Am. St. R. 863 and note; *Gillespie* v. *People,* 188 Ill. 176. 80 Am. St. R. 176. Is there too much liberty in America? If so, blame these constitutions. And corporations fall under the protection of the clause of the constitutions referred to; their legal rights are protected the same as those of natural persons. *Charlotte R. R. Co.* v. *Gibbes,* 142 U. S. 386. If the state allows them to do business, (and it is only citizens doing business in the name of corporations) how can it withhold from them the right of doing competitive business? If the legislature, under the great police power, can restrict the right to associate persons and their means and intellects in the transaction of lawful business, so as to protect other less favored competitors, and so far as it can constitutionally do so, it must be left to it to do so; but until it does so, the individual cannot complain. The very minute these aggregations conspire to do acts harmful to the state, that is, the general public, to raise or depress prices of necessary things, or to restrain trade, they fall under the power of the state; but the mere operation by lawful means of lawful business, however hurtful to individuals, is not actionable. It may cause damage, but it is damage without violation of right. The very minute

the man or corporation, in the operation of business, does an act which is both unlawful and hurtful to another, violative of his right, the wrong-doer is liable to action; but if his act is lawful, he is not liable. This first count charges malicious conspiracy; but if the act is lawful, that matters not. "When the question at issue is, whether one person has suffered legal wrong, at the hands of another, the good or bad motive which influenced the action complained of is generally of no importance whatever. What was said in the opening chapter of this work, that the exercise by one man of his legal right cannot be a legal wrong to another, has been abundantly shown to be justified by the authorities, even if it were not in itself a mere truism. An act which does not amount to a legal injury cannot be actionable because done with a bad intent. Any transaction which would be lawful and proper, if the parties were friends, cannot be made the foundation for an action merely because they happen to be enemies. As long as a man keeps himself within the law by doing no act which violates it, we must leave his motives to Him who searches the heart. To state the point in a few words, whatever one has a right to do another cannot have a right to complain of." Cooly, Torts 830, (688). "If one be moved by malice to the exercise of a legal right, no action arises." 6 Am. & Eng. Ency. L. 872, 875; *Raycroft* v. *Tayntor,* 68 Vt. 219; 33 L. R. A. 225. "A lawful act is not actionable though it proceed from malicious motives." *Glendon Iron Co.* v. *Uhler,* 75 Pa. St. 467. This is strongly illustrated in *Frazier* v. *Brown,* 12 Ohio St. 294, where a farmer dug a hole cutting off underground water accustomed to percolate and ooze through his land to the land of a neighbor, and it was held he was not liable, though he did the act with malice; the motive was immaterial, as he had right to use his land as he pleased. See many cases cited in *Chipley* v. *Anderson,* 11 Am. St. R. 370; *Phelps* v. *Newlon,* 72 N. Y. 39; *Payne* v. *R. R.,* 13 Lea 507; 49 Am. R. 666; *Chambers* v. *Baldwin,* 91 Ky. 136; 11 L. R. A. 550.

What wrongful acts does this first count state? The formation of trade combination, call it monopoly, is not actionable alone. How far the grant of exclusive privilege by the state (and this is the only monopoly, legally speaking) is valid when its right is contested, is one thing. We are not dealing with that. This monopoly is not that. It is the act of persons and corporations, by union of means and effort, drawing to them-

selves, in the field of competition, the lion's share of trade. This is not monopoly condemned by law. The lion has stretched out his paws and grabbed in prey more than others; but that is the natural right of the lion in the field of pursuit and capture. Pity that the lion exists, his competing animals may say; but natural law accords the right, it is given him by the Maker for existence. The state made the Standard Oil Company, and gave it this right of being and working. Better for its competitors were it not so. What other acts besides the formation of this engrossing association does the first count charge? That it caused the West Virginia Oil Company to build a pipe line from its property to the Baltimore and Ohio railroad to ship its oil to the refinery of the Standard Oil Company. Stockholders in the one were also in the other. Had they not the right to build this line to further their own interests, to convey product of the one for refinement by another? A man owning a farm, and also interested in a mill; may not the mill owners induce the farmer to build some means of transporting his wheat to that mill, without being liable to suit by a man owning a railroad which had been accustomed to carry wheat from that farm? And suppose there were no common interest in the farm and mill, cannot the mill owners induce this farmer to build a means of transport from his farm to their mill? Is this soliciting trade, by any unusual means, a legal wrong to competitors? The gravest item under this head is the charge that the Standard Company required oil producers (without specifying any but the West Virginia Oil Company) as a condition precedent to purchasing their oil, to ship through said pipe line, and required those producers in the land of the West Virginia Oil Co. to do so, as a condition precedent to holding their leases, notwithstanding that the more usual and satisfactory route of transport was the pipe line of the plaintiff; and that later the defendants, through the Eureka Pipe Line Company, to further accomplish their purpose of ruining the plaintiff, built a branch pipe line through territory which had for years patronized the plaintiff's line, in order to prevent and forestall the plaintiff from transacting, acquiring or maintaining any business, and from extending its line to any other territory, and that the defendants and confederates by their monopoly and control over the oil business, refused to ship, or permit others to ship, oils, or buy oils shipped through the plaintiff's line, and being the only refiners of oil at Parkersburg and

elsewhere, refused to buy oil shipped through the pipe line of the plaintiff.

At first blush this conduct might appear wrong; but a second thought again presents the question whether the defendants in this did any thing unlawful. The defendant companies were all in common interest. Could they not unite to further their interests? Could not the Standard Oil Company buy from whom it chose? And within the pale of this right could it not impose such conditions as it chose? Cannot the village merchant say to the farmer, "I will not buy your eggs, unless you buy my calico?" Cannot the big mill owner refuse to buy wheat from those who do not ship it over a railroad or steamboat line owned by him? Cannot the mill owner refuse to lease his farm to those who do not sell products to his mill? He may be exacting and oppressive; but can other mill owners sue him for this? Is this right not a part and parcel of his business right? It is the right, even when there is no common ownership, as there is in this case, of one man to buy of whom he chooses, and he can impose arbitrary hard conditions, if the other party chooses to accede to them. So it is the clear right of the other party to sell to whom he chooses, and he having this right, how does the other party do a wrong in purchasing from him? The right of the one carries with it the right of the other. These producers of oil had right to sell to whom they chose, to ship their oil by what pipe line they chose, and they had the right to submit to the terms of the Standard Oil Company, and in view of this right, the company could buy from whom it chose and on such terms as it chose; for the right of the former would bear no fruitage, would be futile, without the corresponding right of contract in the company. Observe, the question here is not one of enforcing a contract in favor of a monopoly, or of determining whether its conditions are reasonable; not a question of how far the courts would go to enforce a contract between the Standard Oil Company and producers, or between the Eureka Company and producers binding the latter to transport oil only over that line. Not a proceeding by the state to forfeit a charter for misuse. The question here is, has the company by illegal act violated the rights of the plaintiff? Counsel for plaintiff put emphasis on the charge of conspiracy and malice, but there can be no conspiracy to do a legitimate act, an act which the law allows, nor malice therein. To give action there must not only be conspiracy, but

conspiracy to do a wrongful act. If the act is lawful, no matter how many unite to do it. *Bohn Co.* v. *Northwestern Co.*, 21 L. R. A. 337. "A conspiracy cannot be made the subject of an action, though damages result, unless something is done which, without the conspiracy, would give right of action. The true test as to whether such action will lie is, whether the act accomplished after the conspiracy is formed is itself actionable." *Delz* v. *Winfree*, 80 Tex. 400. An agreement to get trade into your own hands, that being the sole purpose, though it harm others, is not actionable. *Mogul S. S. Co.* v. *McGregor*, 21 Q. B. Div. 544; 23 *Id.* 598; *Hutly* v. *Simmons*, 1 (1898) 2 B. Div. 181, (see note below). The case cited by counsel, *Morris Run* v. *Barclay Coal Co.*, 68 Pa. St. 173, was a combination of coal companies to enhance prices to the public. So *People* v. *Sheldon*, 139 N. Y. 251. *People* v. *Milk Exchange*, 45 Am. St. R. 609, involved right of a corporation to fix prices of milk, and it was declared against public policy, so as to forfeit charter. *Jackson* v. *Stanfield*, 23 L. R. A. 588, comes nearer the point, though it too has in it the element of an agreement harmful to the public, and is not a case where owners of property and business, as here, seek to further their interests by inducing others to trade with them, and not with competitors. There it was a pure agreement to compel others not to deal with a party, a boycott, not as in this instance, to compel persons to deal with the defendants. *State* v. *Standard Oil Co.*, 49 Ohio St. 137, was an agreement to control production and prices against the public interests, and was a proceeding by the state to withdraw a charter, not an action by an individual on the theory of private injury. I do not say that an individual damaged by a combination aganst public policy and law cannot sue. I say he can. In *Bohn* v. *Northwestern Co.*, 21 L. R. A. 337, it is held that "any man, unless under contract obligation, or unless his employment charges him with some public duty, has right to refuse to work for or deal with any man, or class of men, as he sees fit; and this right which one man may exercise singly, any number may exercise jointly." The wholesale merchants refuse to deal with consumers in favor of retail dealers. Can we consumers sue them? "He may refuse to deal with any man, or class of men. It is no crime for any number of persons, without any unlawful object in view, to associate and agree that they will not work for or deal with certain men, or classes of men, or work under a certain price, or with-

out certain conditions." *Carew* v. *Rutherford,* 106 Mass. 1, 14;
8 Am. R. 287. The great Chief Justice Shaw said that the
legality of the association depends upon its object, and whether
it be innocent or otherwise. *Com.* v. *Hunt,* 38 Am. Dec. 346.
The law allows men to combine to obtain a lawful benefit to
themselves. Greenhood, Pub. Pol. 651. In *Olive* v. *Van Patten,*
7 Tex. Civ. App. 630, while condemning the particular act in-
volved in that case, the court declared the right to compete,
though it injured the plaintiff. "This would be legitimate.
They could do this without responsibility for injurious conse-
quence to the plaintiff's business; but they could not, without
some legal purpose directly serving their own business, mali-
ciously induce others not to trade with the plaitniff." Who can
say that the acts attributed to the defendants did not benefit
them? Had they done these acts to benefit strangers, from
malice, it would be different. Now, these companies were fur-
thering their own interests in lawful competition with others.
If they possessed the lawful right above stated, what matters it
that they did have the intent to cut down the business of others,
or that they did cut it down and injure others, though they did
this that they might themselves fatten? So far this first count
charges only the exercise by the defendants of a right of consti-
tutional liberty, accorded alike to all, simply the rght of self ad-
vancement in legitimate business, self-preservation, we may say.
That in these days of sharp, ruinous competition some perish is
inevitable. The dead are found strewn all along the highways
of business and commerce. Has it not always been so? Will it
always be so? The evolution of the future must answer. What
its evolution will be in this regard we do not yet know; but we
do know that thus far the law of the survival of the fittest has
been inexorable. Human intellect, human laws cannot prevent
these disasters. The dead and wounded have no right of action
from the working of this imperious law. This is a free country;
liberty must exist. It is for all. This is a land of equality, so
far as the law goes, though some men do in lust of gain get ad-
vantage. Who can help it?

Counsel for defendants urge that it does not lie in the mouth
of the plaintiff to charge upon them the maintenance of a
monopoly, for that the plaintiff itself, by this very suit, seeks
to enforce a monopoly in favor of itself and exclude others from
open trade. I do not regard this question as material in the

case, because the sole question is whether the defendants have committed an actionable tort.

Another feature is to be noted. The count does not specify that the plaintiff had any subsisting contracts with oil producers for the conveyance of oil. The field was open to all. If there had been such contracts and frustrated by a malicious conspiracy, it would be actionable, in my opinion, though the cases differ. If done for one's own benefit, it is actionable, there being a fixed contract. Principles stated and cases cited in a Florida case clearly sustain this. It is a luminous case. *Flaccus* v. *Smith,* 7 Am. & Eng. Dec. Eq. 557; *Chipley* v. *Atkinson,* 23 Fla. 206; 11 Am. St. R. 3367. See *Boysen* v. *Thorn,* 21 L. R. A. 233; *Bowen* v. *Hall,* 6 Q. B. Div. 333; *Doremus* v. *Hennesy,* 68 Am. St. R. 203; *Perkins* v. *Pendleton,* 60 *Id.* 252.

There is one charge in the first count which presents a cause of action, and that is, that defendants wickedly and maliciously, to injure the plaintiff, represented to "various persons," customers of the plaintiff, that the plaintiff's pipe lines and appliances were unsafe and dangerous to transport and store petroleum. The question arises whether this count is not too general, or rather, indefinite in not naming the persons to whom such representations were made. Clearly the defendants are entitled to specification here, in order to meet the charge. But is this nomination a necessary part of the declaration? I think not, as it can be done by bill of particulars. Considerable is said of the office performed by bills of particulars in *Clark* v. *Ohio River Railroad Co.,* 39 W. Va. 732. In that excellent late work, Encyclopædia of Pleading and Practice, Vol. 3, page 519, the law is put in a nutshell: "A bill of particulars does not set forth the *cause* of action or *ground* of defense; these constitute the function of the original pleading. The chief office of a bill of particulars is to amplify a pleading and more minutely specify the claim or defense set up." Here the charge is false representation of insufficiency of the plaintiff's machinery and appliances, which is the ground of action; the persons to whom the representations were made are only a specification to make definite and specific the charge, and to limit its generality. The declaration is not bad for this cause.

It is said that in addition to the charge of false representation, there should be a distinct, affirmative, allegation that the representations were false and the machinery good. That would con-

form better to technical pleading; but the word "falsely" will answer this purpose, especially in view of section 29, chapter 125, Code.

*Second Count.* It specifies as its pointed gravamen that the defendants and Shattuck conspired to destroy the plant and business of the plaintiff, and did by threats and unfair means oblige persons owning and producing oil to ship it by other means of transportation than those of the plaintiff, which persons had before been the customers of the plaintiff, and that the West Vrginia Oil Company and Shattuck notified such customers not to ship any oil over the plaintiff's line, and not to permit plaintiff to do any business in transporting oil, so far as such customers could prevent it. While the first count does, the second count does not, state that the defendants were engaged in the business of buying, refining and transporting oil as competitors with the plaintiff, and thus present a justification for their action, but simply charges that they interfered unlawfully and maliciously with the plaintiff's business with malign purpose to destroy it. This, I think, is a legal cause of action. It is argued for the defendants that it is not stated that the plaintiff had contracts with its patrons with which the defendants interfered and without right induced such patrons to break such contracts, and that as such customers had right to deal with whom they pleased, the defendants could not commit an actionable wrong in inducing them to withdraw their usual patronage from the plaintiff. But it does seem to me that though those customers had such right, it did not impart to the defendants any right and immunity to step in between them and the plaintiff and induce those customers to withdraw their patronage, not for the benefit of the defendants in the exercise of the right of free competition, but in malice only to injure and destroy the plaintiff. Cases above cited show this. In *Delz* v. *Winfee,* 80 Tex. 400 26 Am. St. R. 755, it is held that while one has a right to deal with whom he pleases, yet this right is limited to him, and does not give another the right to influence him not to deal. It is an officous act, hurtful to another, not done in ligitimate competition, without just excuse, done only to injure a fellow. It is a "boycott." Cook, Trade & Labor Combin., s. 9; *Crump* v. *Commonwealth,* 84 Va. 927, 10 Am. St. R. 895; Beach on Monop. 311, 322. "In all cases, where a man has a temporal loss or damage by the

wrong of another, he may have an action on the case to be re-paired in damages, the intentional causing of such loss to an-other, without justifiable cause, and with the malicious purpose to inflict it, is of itself a wrong." *Walker* v. *Cronen,* 107 Mass. 555, 8 Am. R. 287. "Every one has a right to enjoy the fruits of his own enterprise, industry, skill and credit. He has no right to be protected against skill and competition, but he has a right to be free from malicous and wanton interference, disturbance and annoyance. If disturbance and annoyance come as a ʼresult of competition, or the execution of like rights by others, it is *damnum absque injuria,* unless some superior right by contract or otherwise is interfered with. But if it comes from the mere wanton or malicious acts of others, without the justification of competition, or the service of any interest or lawful purpose, it then stands on a different footing," and the wrong is actionable. *Walker* v. *Cronen, supra*; 1 Eddy Trade Comb. 3480.

Counsel for defendants, in answer to the second count, take the position that no contract is stated as subsisting between the plain-tiff and its patrons, and that the defendants are not charged with inducing the violation of any contract, and that as these patrons of the plaintiff had perfect right to withhold their patronage, and could not be sued for so doing, the defendants did no legal wrong in inducing those patrons to do so. I do not concur in this view. The authorties above logically repel it. That there is no binding contract between employer and employe, or between trader and his usual customers, makes no difference. Presum-ably, the customers would have continued their voluntary patron-age, but for the wrongful intervention and influence of the in-tervener. I think this contention is met by *Chipley* v. *Atkinson,* 23 Fla. 206, 11 Am. St. R. 367; *Benton* v. *Pratt,* 2 Wend. 385, 20 Am. D. 623; *Rice* v. *Manley,* 66 N. Y. 82, 23 Am. R. 30.

I understand the law to be as follows: One may without lia-bility induce the customers of another to withdraw their custom from him, in the race of competition, in order that the former may himself get the custom, there being no contract; and it is no matter that such person is injured, and it is no matter that the other party was moved by express intent to injure him, motive being immaterial where the act is not unlawful. But where the act is not done under the right of competition, or under the cover of friendly, neighborly counsel, but wantonly or maliciously, with intent to injure another, it is actionable, if loss

ensue. Nor is it material in the latter case that there was no
binding contract between the business man and his customers.
He cannot interfere, even for his own benefit, if there is a con-
tract.

I think the second count states a cause of action but for cer-
tain defects. It names no customers of the plaintiff whom the
defendants instigated to withdraw their custom. This is the
very point of the count. The defendants ought to have specifica-
tion in this important matter. But this can be done by bill of
particulars. The count avers that the defendants used threats
to compel customers of the plaintiff to withdraw their custom.
What threats? What did they have to fear? What was the
means of intimidation? The count does not tell us. As one
may, as a neighbor or friend give advice, it seems to me the
declaration should negative this by importing a wrongful act;
but as it charges the act as done maliciously, with intent to in-
jure, I was put to a query whether that was enough; whether
the allegations of threats was necessary; but the count goes on
that theory as an elemental wrong, and it seems it ought to
specify the threats, so that we may see whether they were such
as to induce a withdrawal of custom. Moreover, it seems to me
that the mere statement that defendants notified customers not
to ship over plaintiff's line, not to store oil with it, not to per-
mit it to do any business, is very general. Ought not some rela-
tion or means of compulsion be shown to exist between the de-
fendants so giving notice and the persons notified to warrant
the idea that the defendants had authority to so notify, some
means of enforcing such notice, some means to influence such
persons? What do the defendants have to meet under this
head? How could they prepare for trial?

We hold the first good, and the second bad, and we reverse
and remand.


Note by BRANNON, JUDGE:

After the Court had considered the above opinion, it occurred
to me that for use in practice where the English books are not
accessible, it would be better to state a little more fully the
holdings of the two English cases cited above and so often re-
ferred to in this connection. In *Mogul Steamship Co.* v. *Mc-
Gregor*, 21 Q. B. Div. 544, affirmed in 23 Q. B. Div. 598, the

syllabus reads: "The defendants, who were firms of ship owners trading between China and Europe, with a view of obtaining for themselves a monoply of the homeward tea trade, and thereby keeping up the rate of freight, formed themselves into an association, and offered to such merchants and shippers in China as shipped their tea exclusively in vessels belonging to members of the association a rebate of 5 per cent on all freights paid by them. The plaintiffs, who were rival ship owners trading between China and Europe, were excluded from all the benefits of the association by the defendants, and in consequence sustained damage: *Held,* that the association being formed by the defendants with the view of keeping the trade in their own hands, and not with the intention of ruining the trade of the plaintiffs, or through any personal malice or ill-will towards them, was not unlawful, and that no action for conspiracy was maintainable." In *Hutlley* v. *Simmons,* 1 Q. B. Div. (1898) 181, the court stated the rule closely: "A conspiracy to do certain acts (not being criminally punishable) gives a right of action only where the acts agreed to be done, and in fact done, would, had they been without preconcert, have involved a civil injury to the plaintiff, for which he would have had a right of action."

Further note by BRANNON, JUDGE:

Since the foregoing opinion was filed my attention has been called to the great case of *Allen* v. *Flood,* decided by the English House of Lords, after a most able and elaborate discussion from many pens of the main questions presented in the foregoing opinion. It is reported in L. R. Appeal Cases of 1898, p. 1. The syllabus is as follows:

"An act lawful in itself is not converted by a malicious or bad motive into an unlawful act so as to make the doer of the act liable to a civil action.

"Discussion of the cases in which evil motive is said to be an essential ingredient in a civil cause of action, such as malicious prosecution: see per Lord Watson, Lord Herschell, and Lord Davey, at pp. 92, 93, 125, 126, 173.

"The respondents were shipwrights employed "for the job" on the repairs to the woodwork of a ship, but were liable to be discharged at any time. Some iron workers who were em-

ployed on the ironwork of the ship objected to the respondents being employed, on the ground that the respondents had previously worked at ironwork on a ship for another firm, the practice of shipwrights working on iron being resisted by the trade union of which the ironworkers were members. The appellant, who was a delegate of the union, was sent for by the ironworkers and informed that they intended to leave off working. The appellant informed the employers that unless the respondents were discharged all the ironworkers would be called out or knock off work (it was doubtful which expression was used); that the employers had no option; that the iron-men were doing their best to put an end to the practice of shipwrights doing ironwork and that wherever the respondents were employed the iron-men would cease work. There was evidence that this was done to punish the respondents for what they had done in the past. The employers, in fear of this threat being carried out (as they knew) would have stopped their business, discharged the respondents and refused to employ them again. In the ordinary course the respondents' employment would have continued. The respondents having brought an action against the appellant, the jury found that he had maliciously induced the employers to discharge the respondents and not to engage them, and gave the respondents a verdict for damages:—

"*Held,* Reversing the decision of the Court of Appeals (1895) 2 Q. B. 21 (Lord Halsbury L. C. and Lords Ashbourne and Morris dissenting), that the appellant had violated no legal right of the respondents, done no unlawful act, and used no unlawful means, in procuring the respondents' dismissal; that his conduct was therefore not actionable however malicious or bad his motive might be, and that notwithstanding the verdict the appellant was entitled to judgment."

<em>Reversed.</em>