HITCHMAN COAL & COKE CO. v. MITCHELL et al.

(Circuit Court, N. D. West Virginia. September 21, 1909.)

1. TRADE UNIONS (§ 1*)—LABOR ORGANIZATIONS—LEGALITY AND RIGHTS.

A voluntary association of working men, whether secret or not, for the mutual benefit of its members, is lawful, if the purposes they seek to attain and the means employed to that end are peaceable and lawful; and among the rights of its members is that of collectively and peaceably leaving the service of their employer when the terms thereof become unsatisfactory to them, and also the right under ordinary circumstances to solicit other workmen to join their association by reason, argument, and persuasion.

[Ed. Note.—For other cases, see Trade Unions, Cent. Dig. § 1; Dec. Dig. § 1.*]

2. INJUNCTION (§ 101*) — COMBINATIONS — INTERFERENCE WITH CONTRACT BY THIRD PERSONS.

An employer and its employés may lawfully contract with respect to the terms of the employment, and as incidental thereto that the employés shall not join a labor union and the employer shall not employ union men; and, when such a contract has been made, a combination between officers or members of the labor union to induce either party to violate the contract, with which they have no rightful concern, constitutes an unlawful conspiracy, to restrain the carrying out of which the other party is entitled to an injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 175; Dec. Dig. § 101.*]

In Equity. On motion to modify preliminary injunction.

Upon October 24, 1907, the plaintiff corporation presented its bill for injunction to a judge of this court against John Mitchell and nine others, alleging itself to be a corporation under the laws of West Virginia and the defendants to be citizens and residents of several different states other than West Virginia; that nine of said defendants first named are presidents, vice presidents, and secretary-treasurers, respectively, of the United Mine Workers of America, and of the International Union United Mine Workers of America, of District No. 6 United Mine Workers of America, and of subdistrict 5 of District No. 6 United Mine Workers of America, and the defendant Thomas Hughes to be an organizing agent of said organizations; that plaintiff is the owner of about 5,000 acres of coal, has a mine and mining plant on the Baltimore & Ohio Railroad that is mining and shipping a daily output of about 1,400 tons of coal, largely under contracts, between 500 and 600 tons to the railroad for its daily engine fuel, and has large contracts for future delivery;

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that prior to April 1, 1906, it operated its mine by employment of men affiliated with the United Mine Workers of America, but on that day a strike was ordered by the officers of the union, and on April 16, 1906, the men so employed, in obedience to the demands and orders of defendants, went out and ceased to work. It is charged that this strike was ordered because certain other operators refused to sign the scale demanded by the union; that so far as plaintiff was concerned it was wholly without justification or excuse, because it distinctly agreed to pay the scale price and any increased price fixed thereby from April 1, 1906, the date of the strike order, whenever it might be fixed and agreed upon, with which proposition the miners themselves, whose labor was involved, were entirely satisfied; that notwithstanding this, at the instance of defendants, its mine was shut down from April 16 to June 12, 1906, to its great financial loss and embarrassment by reason of its inability to comply with its existing contracts. The bill then sets forth in detail in effect that on the last-named date, in order to be able to run said mine, it entered into a contract with its men whereby it agreed with them to run its mining operation wholly upon a nonunion basis, refusing absolutely to employ any union men, and whereby the men on their part agreed not to join or become members of this union and to work for plaintiff as nonunion men; that plaintiff has since that time been running its mine under this contract with its men to the entire satisfaction of both, paying its men as high wages as paid in any of the union mines. It then charges the officers and agents of the union, with full knowledge of the existence of this contract, to have repeatedly sought to have plaintiff violate it and agree to reunionize its mine, which plaintiff has refused to do, whereupon such union officers and agents are seeking by inducements, threats, and intimidation to induce plaintiff's employés, bound by said contract with it, to leave its service, break their contract, join the union, and also to prevent other men from engaging in its employ, and this it is charged with the unlawful purpose to prevent any but union men to work in its mine, compel it to employ none but union men, and to submit its business and its property to the jurisdiction and control of said union and its officers. The bill then proceeds to charge the United Mine Workers' Union of America and its subordinate organizations to be unincorporated organizations, having unlawful purposes and designs to create a monopoly and trust in coal mining labor, and in support of these allegations sets forth in extenso what purports to be excerpts from the constitutions and by-laws of the supreme and subordinate unions, together with the obligation required to be taken by its members and extracts from the proceedings of its national conventions. A distinct conspiracy on the part of defendants as individuals is charged to secure, by reason of their positions as officers of this union, the abandonment by the men of their contract with plaintiff, their joining the union, the inability of plaintiff to employ others, and the entire shutting down of its mine, to its irreparable loss and injury. Presented with this bill were some 28 affidavits in support of its allegations. A temporary restraining order was granted until the next regular term of court, to be held at Parkersburg on January 14, 1908, for which date plaintiff's motion for a temporary injunction was set down for hearing. This hearing, on motion of defendants, was continued until May 26, 1908, when plaintiff presented more than 20 additional affidavits and argued its motion for temporary injunction; counsel for defense stating they "did not desire to be heard in opposition to said motion so far as the granting of a temporary injunction at the time was concerned, and not consenting, but objecting, thereto." The temporary injunction was on that day granted in exact accord with the terms of the restraining order.

Answers have been filed, exceptions entered thereto, motions as to certain unserved defendants to have said bill dismissed as to them have been made, and a motion by defendants, disclaiming "any intention of conceding the truth of the allegations of the plaintiff's bill whereby fraud, coercion, and intimidation or violence in any form whatsoever is imputed to them," has been entered to dissolve the injunction, "on the face of the bill and exhibits," in so far as said injunction restrained said defendants, or any of them, from the use of argument, reason, and persuasion, to induce the employés of the plaintiffs, or any of them, to become members of the United Mine Workers of America or any of its subordinate branches; in so far as it restrains them from interfering

or talking to any person or persons in the employment of the plaintiff, or about to enter the employment of the plaintiff, for the purpose of inducing such persons to become members of the United Mine Workers of America or any of its subordinate branches, in a peaceable and law-abiding manner, and unaccompanied by intimidation, force, fraud, violence, or coercion; also in so far as it restrains defendants from visiting the homes of plaintiff's employés for the purpose of inducing them by reason, persuasion, and argument, unaccompanied by force, fraud, intimidation, violence, or coercion, to become members of the United Mine Workers of America or any of its subordinate branches; in so far as it restrains defendants from going near the premises of plaintiff for the purpose of talking with or inducing the employés of plaintiff to become members of the United Mine Workers of America; in so far as it restrains from unionizing or attempting to do so plaintiff's mine, if by "unionizing" is meant action on the part of defendants to induce the employés of plaintiff to become members of the United Mine Workers of America by the use of argument, persuasion, and reason, unaccompanied by force, violence, coercion, or intimidation; and also in so far as it restrains defendants from interfering with plaintiff's employés, if by the term "interfering" is meant that defendants shall be precluded from interviewing and visiting plaintiff's employés for the purpose of inducing them to become members of the union. This motion on April 7, 1909, was argued and submitted, and is now to be determined.

George R. E. Gilchrist, for plaintiff.
Charles E. Hogg, for defendants.

DAYTON, District Judge (after stating the facts as above). That this motion has been most thoroughly and ably argued goes without saying, when the character and ability of counsel engaged is considered. It is a source of regret that, because of a multitude of duties, I have not had even more time to consider the questions involved than I have taken; but the fact that all these questions may again be presented and considered upon a final hearing, and above all may be finally reviewed by a higher court, with full power to correct any error I may commit, has led me to comply with request of counsel for an early decision as to this motion. It is to be borne in mind that this motion is made only for partial dissolution, and that, too, without prejudice to defendants' right to move for full dissolution upon final hearing. It is based solely upon the ground that the allegations of the bill on its face warrant, if they do not demand, it. Under these circumstances, while I am entitled to construe the allegations of the bill, and all of them, in the light most favorable to the plaintiff as upon demurrer. I am not inclined, at this time, to consider the charges, substantially made, that the United Mine Workers of America is an unlawful organization seeking to establish a monopoly in labor contrary to the common law, or a trust therein contrary to the Sherman act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). Such questions deserve more consideration than I have had time yet to give them, and may well be postponed to the final hearing after the case has been fully made up, if it then becomes necessary to decide them under the conditions at that time existing.

Nor do I regard it necessary to discuss the utility or futility of labor organizations. The right of labor to organize for its mutual benefit and protection is as well settled and determined by law as the right of capital to organize for the same purpose. That one may resort to the voluntary association of individuals without incorporation and the

other to articles of incorporation is wholly immaterial, provided the voluntary association be one for lawful purposes and be conducted in lawful manner. That such associations may be secret in character, may have and enforce by-laws, and act through officers and agents, cannot longer be disputed. Their members may stand together, may accumulate funds for the support of those of their number not employed, may unite with other unions, may advise with their officers and others as to their interests and employment, may expel those who refuse obedience to the authority of the association's laws, and may individually or collectively peaceably leave their employer's service when the terms thereof become unsatisfactory to them, as so clearly set forth by Taft, Judge, in Thomas v. C., N. O. & T. P. Ry. Co. (C. C.) 62 Fed. 803, by Thayer, Judge, in Hopkins v. Oxley Stave Co., 83 Fed. 912, 28 C. C. A. 99, and by Mr. Justice Harlan in Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310, 25 L. R. A. 414. It is absolutely needless to add that, under ordinary circumstances, the right of the members of a labor union to solicit others and by reason, argument, and persuasion induce them to join their labor associations is just as clear a right as that of members of fraternal organizations, such as Masons, Odd Fellows, and the like, to do the same thing. While all these things are true, it is not to be forgotten that associations organized for the best and noblest purposes, church organizations even, may be misused by those who have secured control for the purpose and prostituted them to unlawful purposes and designs. When this is done, it becomes as much the duty of the law to restrain them from lawlessness as is its duty to stay the hand of the legally incorporated company of capital that has perverted its lawful purposes to lawless deeds.

It is necessary for us in this case to recognize that this is not a controversy between plaintiff and its employés; it is not a strike; it is not a case where the labor union has longer any legitimate interest or concern. If the allegations of this bill are true, the employés of this company are not members of this union, but have actually contracted with the company not to become members of it as a condition precedent to their employment. Mr. Justice Harlan, in Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436, speaking for the Supreme Court, says:

"While, as already suggested, the right of liberty and property, guaranteed by the Constitution against deprivation without due process of law, is subject to such reasonable restraint as the common good or the general welfare may require, it is not within the functions of government—at least, in the absence of contract between the parties—to compel any person, in the course of his business and against his will, to accept or retain the personal services of another, or to compel any person, against his will, to perform personal services for another. The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. So the right of the employé to quit the service of the employer, for whatever the reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employé. It was the legal right of the defendant, Adair, however unwise such a course may have been, to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so, however unwise such a course on his part might have been, to quit the service in

which he was engaged, because the defendant employed some persons who were not members of a labor organization. In all such particulars the employer and the employé have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract, which no government can legally justify in a free land."

And many cases are cited in support of these principles. It necessarily follows that if the employer can discharge his employé because he belongs to a labor organization, and if the employé can quit his employment because his employer employs nonunion men, they two, having these personal and individual rights, can contract with each other as to what the status of the employment in this particular shall be. The employé on his part may require, as a condition precedent to the sale of his labor, that the employer shall buy it under the terms and upon the conditions prescribed by the labor union, and, moreover, shall employ his other labor upon the same terms. If the employer contracts to do this, he must be held to his contract; for he has accepted the labor upon those conditions. Per contra, the employer may contract with his employé to buy his labor upon terms other than the union ones, and, in order that the union ones may not be disturbing elements in the conduct of his business, may bind his employé not to become a member of the union, and thereby disqualify himself, it may be, by reason thereof, from continuing his employment upon the terms and conditions of the contract. These views seem to be clearly established in principle by this Adair Case and the authorities cited therein. With full knowledge that such a contract has been legally consummated between employer and employé, what legal status has the union in the premises? It may regret that its advice, help, and assistance was not sought by the employé in disposing of his labor; but, now that it is disposed of, can it come forward and incite either to break the contract? Its mission, it claims, is to aid and uplift labor; but it could hardly fulfill this mission by persuading men to become breakers of contracts and the repudiators of their lawful promises and pledges, and, if they do, their legitimate functions are prostituted into a conspiracy to destroy others' vested contract rights.

In Arthur v. Oakes, 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414, it is held:

"According to the principles of the common law, a conspiracy upon the part of two or more persons, with the intent, by their combined power, to wrong others or to prejudice the rights of the public, is in itself illegal, although nothing be actually done in the execution of such conspiracy. This is fundamental in our jurisprudence. So a combination or conspiracy to procure an employé or body of employés to quit service in violation of the contract of service would be unlawful, and in a proper case might be enjoined, if the injury threatened would be irremediable at law."

And the Supreme Court of the United States, in Angle v. C., St. P., M. & O. R. Co., 151 U. S. 1, 14 Sup. Ct. 240, 38 L. Ed. 55, and Bitterman v. L. & N. R. Co., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171, have distinctly set forth this same general principle in cases involving a different state of facts.

In Transportation Co. v. Oil Co., 50 W. Va. 611, 40 S. E. 591, 56 L. R. A. 804, 88 Am. St. Rep. 895, the Supreme Court of Appeals of this state has held:

"If one wantonly and maliciously, whether for his own benefit or not, induce a person to violate his contract with a third person, to the injury of that third person, it is actionable."

And in Thacker Coal Co. v. Burke, 59 W. Va. 253, 53 S. E. 161, 5 L. R. A. (N. S.) 1091, this doctrine as to contracts generally is reaffirmed and applied to labor contracts. It is there held:

"One who maliciously entices a servant in actual service of a master to desert and quit his service is liable to action therefor."

And again:

"The act found in Code 1899, § 14, Append. p. 1053, does not authorize any individual, or number of individuals, to maliciously entice servants to desert service in which they are engaged, or to prevent them from engaging in such service under a contract for such service."

These last two cases, recent in date, decided by its court of last resort without dissenting voice, would seem absolutely to settle the law of this matter in this state. But it is insisted that to ask and induce, by reason, argument, and persuasion, plaintiff's employés to join a labor union, is not asking them directly to violate their labor contracts. It is, so far as this organization is concerned. They have not only contracted, as a condition to their employment, that they will not join this particular union; but, if they do join it, they must absolutely quit such employment, because the plaintiff has contracted not to employ members of this union, and this union has on its part, by its laws, solemnly declared that none but its members shall be employed at the mine.

But, in addition to this question of inducing the violation of lawful contracts, it seems to me very clear that, no matter how meritorious an organization this United Mine Workers of America may be in purpose and intent, the allegations of this bill, if true, and they must be conceded to be so upon the determination of this motion, disclose as plain a conspiracy upon the part of these defendants to injure and ruin the plaintiff as could well be conceived of. They have secured control of this organization. They have bound its members to obey their orders and do their will. Clothed with this power, they have said to plaintiff: "Notwithstanding you have complied with all the requirements of the organization, have agreed to all its terms and conditions, have employed only union men, have secured near $10,000 to the union's funds in the way of dues from your miners, we propose to stop your operations, require your men to cease working for you, shut down your mine, compel you to violate and lose your contracts," and, in accordance with this purpose to injure, have actually carried out these declarations, have stopped operations, have called out the men, and compelled them, against their will, to cease work, have shut down the mine, and held it in this condition from April 16th to June 12th, some 50 working days, at a loss, judging from the output of the mine, that may be estimated from $300 to $700 per day, and with then no promise of let-up before plaintiff's final ruin should be accomplished. What excuse is set up for so foul and injurious prostitution of this organization, claimed to be in existence for philanthropic and lawful purposes, to a conspiracy so glaringly designed to injure and destroy? The sole excuse is alleged to be that some of plaintiff's

rival operators refused to comply with the union's demands and exactions! Rival operators, whose actions plaintiff necessarily could not control! Rival operators, who under many conditions might design and scheme to bring about this very condition of things in order to ruin plaintiff and destroy its rivalry! Such an excuse, if it be the only one that can be advanced, adds only insult to injury, and makes more clear and irrefutable the existence of the conspiracy alleged.

Actuated by a natural sympathy for labor and an earnest desire to uplift and aid it, which we all have, many sincere, but misguided, persons would concede to it an estate superior to and above that possessed by other classes in this republic of liberty and equal rights, and they are fond of denouncing courts of equity for staying the hands of labor leaders in their unlawful exercises of power to achieve this end. We must not forget that we have a Constitution guaranteeing these equal rights, and that courts established thereunder have no discretion in enforcing its guaranties in favor of all those who are denied them and may appeal for redress. As said by Snyder, Judge, in State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863:

"A person living under the protection of this government has the right to adopt and follow any lawful industrial pursuit, not injurious to the community, which he may see fit. And, as incident to this, is the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties, to enforce all lawful contracts, to sue, to give evidence, and to inherit, purchase, lease, sell, and convey property of every kind. The enjoyment or deprivation of these rights and privileges constitutes the essential distinction between freedom and slavery—between liberty and oppression. * * * The vocation of an employer, as well as that of his employé, is his property. Depriving the owner of property of one of its attributes is depriving him of his property, under the provisions of the Constitution. People v. Otis, 90 N. Y. 48. The right to use, buy, and sell property, and contract in respect thereto, including contracts for labor—which is, as we have seen, property—is protected by the Constitution."

And again:

"The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic under similar circumstances."

These principles were enunciated in a decision holding unconstitutional a legislative act, passed at the instance of labor organizations, which sought to regulate the method of payment of labor wages. The Adair Case, to which I have referred, held unconstitutional an act of Congress seeking to restrict the right of an employer to discharge his employé because of his membership in a labor organization. These are but two of many cases illustrating how carefully these inalienable property rights have been and must be guarded by the courts, in order that our liberties under constitutional government may be perpetuated.

It seems clear that under the allegations of this bill a conspiracy has existed between these defendants to injure and destroy the plaintiff's business; that it has already occasioned a damage of many thousand dollars to it, which, it would seem from the authorities we have cited, plaintiff has a clear right to institute its action at law to recover against them, personally and independent of their connection with the labor

organization and any relation it, as such, may have to the controversy. The important question now arises whether, this injury being an accomplished fact, there remains any reason for the exercise of the restraining power of equity through the intervention of this injunction. Is this conspiracy a thing of the past, or does it continue at the present time for the same original purpose to injure and destroy? Here the allegations can have no uncertain meaning. It is charged in effect that these defendants, thwarted in their purpose for the time being by the making of the contracts with the employés direct, now are actively seeking with renewed effort to achieve their unlawful purposes; that they have the same control over the labor organization; that its by-laws still require the same exclusion from work at the mines, under its control, of all nonunion labor; that its members are to be bound by the same obligation to cease labor when ordered to do so by these defendants as its officers; that they were, at the time the injunction was granted, actively seeking to persuade plaintiff's employés to break their contracts and become members of this organization, bound by such laws and obligations; that their organizing agent has been sent upon the ground, and has stated, as shown by affidavit filed, that:

"He had succeeded in having 125 men at the Hitchman mine sign their names, agreeing to become members of the United Mine Workers, and that just as soon as he got 25 more names he was going to shut the Hitchman mine down."

Surely these things, if true, negative any idea of abandonment of the conspiracy; and they would, if true, fully justify the charge that plaintiff is in imminent danger of irreparable loss and injury unless equity shall intervene. It would, then, seem that such intervention is necessary for the protection of all parties concerned. The language of the Circuit Court of Appeals (Fourth Circuit) in Atwell v. United States, 162 Fed. 97, 89 C. C. A. 97, 17 L. R. A. (N. S.) 1049, applied there to the court's discretionary power to punish for contempt, may well be here applied to the necessity for it to exercise the injunctive power in a case like this:

"Very frequently those who complain the loudest against its exercise are ultimately benefited the most. Men, inflamed by passion, are frequently not capable of rightly judging of their own conduct or of foreseeing the consequences thereof. In such cases the restraining power on the part of judges, acting under solemn obligations to do 'equal right to the poor and to the rich,' chastened and humbled by the sense of the weighty responsibilities laid upon them, may save such persons from liability to civil and criminal actions, calculated to bring to them ruin and loss of liberty."

The motion to modify or dissolve this injunction in any particular must at this time at least be overruled.