THE H. W. GOSSARD COMPANY, Appellant, v. HELENE C. CROSBY, Appellee.

**Injunctions:** DISSOLUTION. A temporary writ of injunction may be dissolved upon motion, supported by affidavits disclosing defensive matter, before the filing of an answer to the petition.

**Same.** The granting and dissolution of a temporary injunction is
largely discretionary and will not be reversed unless a clear
case of prejudicial error is disclosed.

**Contracts of employment:** BREACH: SPECIFIC PERFORMANCE: IN-
JUNCTION. Equity will not specifically enforce a contract for
personal services; nor can an employer restrain a servant who
has left his employ prior to the expiration of his contract from
engaging in the service of another unless there is a plain nega-
tive covenant in the contract of employment, and then only
when the service is of such special and unusual character that
the loss cannot be adequately compensated in damages.

**Specific performances.** It is generally held that specific perform-
ance will not be decreed in favor of one party where similar
relief could not be granted against the other party for his re-
fusal to perform.

**Contracts of employment:** BREACH: SPECIAL QUALIFICATION: PLEAD-
ING. A petition alleging in substance a high degree of profi-
ciency in the sale of goods does not show such special or
extraordinary service as to justify an injunction restraining an
employé, who has broken a contract of employment, from en-
gaging in the service of another.

**Injunction:** FINANCIAL IRRESPONSIBILITY. The mere fact that a
servant, who has broken his contract of employment, is not
financially responsible will not support an injunction restrain-
ing him from engaging in the service of another.

**Trade secrets:** SKILL: INJUNCTION. With the exception of val-
uable trade secrets acquired while in a given service, an em-
ployé may use the skill and knowledge there gained in the
service of a rival, though wrongfully leaving the original em-
ployment.

*Appeal from Woodbury District Court.*— HON. J. L. KEN-
NEDY, Judge.

THURSDAY, OCTOBER 25, 1906.

THE opinion states the case.— *Affirmed.*

*Edmund S. Carr* and *E. M. Corbett,* for appellant.

*Hubbard & Burgess,* for appellee.

WEAVER, J.— The petition, which is in equity, alleges
that plaintiff is a corporation doing business in Chicago,
Ill., as a manufacturer and wholesale and retail dealer in
ladies' corsets, and in the importation and sale of trimmings,
laces, silks, and dress furnishings, and that its sales of said
merchandise are and have been largely carried on by and
through the agency of traveling representatives; that on
October 5, 1904, the plaintiff entered into a written contract
with the defendant whereby said defendant undertook to
work for the plaintiff for a period of three years as corset
saleswoman and demonstrator at a stated weekly salary and
expenses incurred in the service; that defendant did in fact
enter the company's service under said contract, and con-
tinued therein for a period of about four months when,
without any cause whatever, she abandoned said employ-
ment, and has ever since refused to perform her part of
said contract. As the further statement of plaintiff's cause
of action constitutes a claim which is new or at least un-
usual in the courts of this State we quote it at large in the
language of the petition:

Third.   Plaintiff, further complaining of said defend-
ant, alleges and avers: That the style of corsets as aforesaid
manufactured, sold, and dealt in by it have a front lacing,
leaving the back of the corset free from the heavy boning,
eyeletting, and lacing, which obtain in the corsets in general
use, and are otherwise distinguished as being highly flexible
and acting as an abdominal and spinal support, and that for
and during several years heretofore, in order to introduce
and create a demand for and to sell said front lace corsets
so manufactured by it as aforesaid, it has expended large
sums of money in advertising the merits of the same,
through the medium of traveling representatives, agents,
and salespeople, and thereby has visited the various towns
and cities of the United States showing, exhibiting and sell-
ing its said front lace corsets, and has also expended large
sums of money in advertising its said front lace corsets in
the leading periodicals and newspapers of the country, and
which said front lace corsets were, at and before the time

of the grievance hereinafter mentioned, widely known as a valuable and useful article of merchandise, and had acquired a high reputation as such, and commanded and still commands, as a valuable and useful article of merchandise, an extensive sale at the said cities of Chicago, Minneapolis, St. Paul, and Sioux City, and in the other cities and towns of the United States and Canada, and which for the last several years has been a source of great profit to said plaintiff. And to more effectively create a demand for the said front lace corsets so manufactured and sold by the plaintiff the plaintiff inaugurated the plan of giving lectures and demonstrations, by a lady lecturer and demonstrator, such lectures pertaining to the physical culture of woman and the proper corsage to secure to her health, comfort, and physical beauty, and at the same time exhibiting and showing the many advantages of the corsets so manufactured and sold by plaintiff as adding to her physical beauty, comfort, and health, as well as the durability, fit, and advantage in said front lace corsets. That among the many duties and services of said defendant under the said contract, was that of such lecturer, demonstrator, and saleswoman of said front lace corset so handled and sold by the said plaintiff as aforesaid, and that said services were and are special, unique, and extraordinary in their character, and call for a person of high mental culture and refinement, of strong and pleasing individuality, good address, prepossessing appearance, striking physical development, possessing a knowledge of physical culture, and ability as a lecturer as well as the quality of high-class salesmanship, which characteristics, accomplishments, knowledge, attainments, and qualifications were and are possessed by the defendant in a marked degree, and which are rarely found in women, and the services of such a woman so combining such characteristics can rarely be secured, all of which were well known to said plaintiff as well as to the said defendant at the time of the making and entering into of said contract, and were the inducements which caused said plaintiff to enter into said contract with said defendant, and that the services and duties of said defendant under said contract were and are of such a character as to render it practically impossible for said plaintiff to replace her or to employ any other person to take her place, and has in fact been unable to find another competent person to take her place although it has made a diligent

effort so to do, since the defendant refused to longer remain in the employ of plaintiff.

Fourth.   Further complaining of the said defendant said plaintiff alleges and avers: That ever since said defendant wrongfully quit the employ of said plaintiff she has engaged in the sale and demonstration of a front lace corset similar in construction, design, make, and material to the front lace corset manufactured and sold by said plaintiff, and that the said defendant has wrongfully procured and engaged other persons to manufacture and sell such corsets, and has herself been engaged and is now engaged in visiting the various cities and towns of the United States, and at the present time is so engaged in the city of Sioux City and State of Iowa, in the advertisement, demonstration, and sale of said corsets and in giving lectures on the physical culture of woman, and the correct corsage to secure to her physical beauty, health, and comfort, and has used and is now using the knowledge, information, and skill gained and acquired by her while in the employ of this plaintiff in the furtherance of her said business, and is engaged in using the same methods as to the advertisement, demonstration, and sale of said corsets so wrongfully sold by her as aforesaid that were inaugurated, conceived, suggested, and taught her by the said plaintiff, and which methods she was hired and employed by said plaintiff to use, and has brought the said corsets now caused to be manufactured and sold by her into active competition with the corsets manufactured, sold, and dealt in by the plaintiff as aforesaid; and whereas, said plaintiff had theretofore and before the wrongful acts of said defendant, as above set forth, enjoyed the exclusive trade and sale of said corsets so made and sold by it as aforesaid, it is now brought into damaging and injurious competition with the said corsets so advertised, demonstrated, and sold by the said defendant as above set forth; and whereas, there had been theretofore no corset of similar design, style, or construction upon the market, and that said defendant has announced, and still continues to announce, her determination to continue in her wrongful conduct as aforesaid and to continue to advertise, demonstrate, and sell her said corsets, and to continue to bring the same into injurious and damaging competition with the said corsets handled and sold by this plaintiff, and threatens to continue the same in the future as in the past, in violation and breach

of her said contract of hiring, and in utter disregard and contempt of the same. That the defendant is a person of small financial responsibility, and is unable to respond in damages to any judgment which plaintiff may recover for breach of said contract or the wrongful acts and misdoings of the defendant, as aforesaid. That the damage to said plaintiff, done and created by the said defendant as aforesaid, is not susceptible of pecuniary compensation, and cannot·be estimated with any certainty, and is constantly recurrent, and that great and irreparable damage has resulted, and will result and be produced by the unlawful acts, and threatened acts, of said defendant, and that the same will cause great and irreparable damage to said plaintiff and to its said business, and that the plaintiff has no adequate legal remedy at law in the premises, and that the granting of an injunction herein, restraining and enjoining such acts, conduct and doings, as aforesaid, will prevent innumerable actions at law and constantly recurring damages, and will afford plaintiff its only relief in the premises.

Upon these allegations, plaintiff demands damages in the sum of $10,000 and for a writ of injunction restraining the defendant, her agents, servants, and employés, " from advertising, demonstrating, selling, or in any manner whatsoever disposing of the front lace corsets now advertised, demonstrated, and sold by the said defendant, her agents, servants, or employés, and which are now, or may be hereafter, possessed, owned, or controlled by said defendant, her agents, servants, or employés, or any other or similar kind or style of front lace corsets, either on the part or account of said defendant, or as agent, employé, demonstrator, or lecturer of and for others engaged in the sale thereof, and restraining and enjoining said defendant from any act, conduct, or doing whatsoever causing damage to said plaintiff by reason of the violation of the terms of said contract so entered into with plaintiff by said defendant."

The written contract attached to the petition contains the following stipulation as to the services to be performed by the defendant: .

The party of the second part is to work for the party of the first part in the capacity of corset saleswoman and demonstrator, in such cities and states as the party of the first part may desire. The party of the second part agrees to give her entire time and attention and best abilities to the interest of the party of the first part, and the party of the first part agrees to pay the party of the second part therefor, in addition to all reasonable expenses, a salary of thirty ($30.) dollars per week, to be paid weekly each and every week during the first year; and a salary of thirty-five ($35.) dollars per week, to be paid each and every week during the second year, and a salary of forty ($40) dollars to be paid each and every week during the third year. It is further provided that in case each party is not entirely sat-. isfied with all the provisions of this contract, it may be canceled by either party, at the end of thirty (30) days, or on November 10, 1904, after which date it shall be in full force and effect.

Upon the foregoing petition a writ of temporary injunction was issued as prayed. No answer was filed to the petition, but defendant filed a motion to dissolve the injunction and supported the same by an affidavit specifically denying the material allegations on which the prayer for the writ is based. In this affidavit she avers that her service with plaintiff was rendered unsatisfactory and uncomfortable by the plaintiff's unnecessary and undeserved criticism of her work, by refusing to pay the salary due her, or to advance her traveling expenses according to the terms of their contract, by insisting upon her traveling with a man as an advance agent who was a stranger to her and with whose character and reputation she was not acquainted, and by refusing to allow her to conduct her canvass for customers in the manner which her experience indicated as the most effective and profitable. She further avers that long before she contracted with the plaintiff she had been engaged in the business of buying and selling front lace corsets of the same general kind as those which she undertook to sell for the plaintiff, and that there is nothing new or

unusual about such article, and its introduction and sale called for no special knowledge or skill not possessed by many persons. . She denies that while in plaintiff's service she acquired any knowledge or information of a confidential nature concerning said business and especially denies that since leaving said service she has made use of any knowledge or skill so obtained, in competition with the plaintiff. She further affirms that plaintiff by its officers has repeatedly expressed its satisfaction with her withdrawal from its service, saying in one instance, " We have found one better than Crosby," and in another, " We will stand for no bluffing, and if there are those in our organization who cannot work harmoniously for the best interests of W. H. Gossard & Co., and exert their best endeavors for our interests, it is well for them to pack up their tents like the Arab," etc., " There are larger fish in the sea than have ever been caught." Many other matters are alleged of the same general nature as those already stated, but we need not further rehearse them. The district court sustained the defendant's motion, vacated the injunction, and plaintiff appeals.

· I. It is first said on part of appellant that, as the appellee had not filed an answer, the allegations of the petition must be taken as true for the purposes of the motion to dissolve, and it was error therefore to vacate the injunction. The filing of an answer is not essential to defendant's right to be heard upon a motion to dissolve. Code, section 4361. While, according to long-established practice dissolution may sometimes be ordered upon the filing of an answer denying all the equities asserted in the petition, our statute above cited provides that the motion may be made either before or after the answer, and that it may be supported by affidavits. Code, section 4369. · It would seem, therefore, that a defensive showing made by affidavit is to be accorded the same effect in ruling upon the motion as would be given to the same matter if pleaded as a formal answer. We think there was no such confession of

1. INJUNCTIONS: dissolution.

the plaintiff's alleged equities as would upon that ground alone render the dissolution of the temporary writ erroneous.

The dissolution as well as the granting of the temporary writ is so much a matter of discretion in the trial court that this court will require a very clear case of prejudicial error before ordering a reversal. This is especially true as applied to the dissolution of a temporary writ because the ruling does not operate as a final adjudication, and ordinarily the rights of the parties may be fully protected when the cause has been heard upon its merits. Nor is the case before us one in which injunction is the sole relief sought, thereby rendering the temporary writ more especially appropriate; for, in addition to the injunction, plaintiff demands a large recovery in damages for the breach of defendant's contract.

**2. SAME.**

Passing the preliminary question referred to in the preceeding paragraph, we come to consider the merits so far as is necessary for the purposes of the present appeal. These we are to gather from the contract itself, the averments of the petition and the showing made in support of the motion to dissolve. The question thus presented requires us to consider how far equity will aid in enforcing the specific performance of contracts for personal service. That an injunction in favor of an employer against an employé forbidding the latter to engage in the service of another is in the nature of a decree for specific performance, see 4 Pomeroy's Eq. Jur. (3d Ed.) Section 1341. It may also be stated to be a universally recognized general rule that the remedy for a violation of contract to perform personal service or labor is at law, and the damages there recoverable constitute the full measure of relief to which the employer is entitled. This is so for the very good reason, if for no other, that there is no method known to our system of law or equity by which specific performance of an agreement to labor can be enforced. Any system or plan

**3. CONTRACTS OF EMPLOYMENT: breach: specific performance: injunction.**

by which the court could order or direct the physical coercion of the laborer would be wholly out of harmony with the spirit of our institutions, and his imprisonment would take away his power to make specific performance. Even if such authority existed its exercise would be undesirable. If the relation of employer and employé is to be of value or profit to either it must be marked by some degree of mutual confidence and satisfaction, and when these are gone and their places usurped by dislike and distrust, it is to the advantage of all concerned that their relations be severed. In the language of the federal court in *Boyer v. Telegraph Co.* (C. C.) 124 Fed. 249. " It would be intolerable if a man could be compelled by a court of equity to serve another against his will, or if a man could be compelled to retain in his employ one he does not want; courts of equity exercise no such power and grant no such relief." It is the right of the employer to discharge his employé and of the employé to quit his employer's service at any time with or without cause, subject to no other penalty than a judgment for damages for the breach of the contract or hiring. Such is certainly the general rule.

Formerly this rule was substantially without exception, but in later years there has arisen a class of cases tending to recognize certain exceptions thereto. In the early English case *Kemble v. Kean,* 6 Sim. 333 the defendant Kean, an eminent actor, had engaged to play at plaintiff's theater, and expressly bound himself not to play at any other theater in London during the stated period. He abandoned this engagement, and plaintiff sought an injunction to prevent his entering the service of any other person in violation of the agreement. The relief was refused for reasons substantially such as we have above suggested. In the later case of *Lumley v. Wagner,* 1 De Gex M. & G. 604, an injunction was sustained, and it is generally cited as overruling Kemble v. Kean, though this conclusion is not universally accepted. The Lumley case was based upon a con-

tract in which the employé, an actor, had expressly agreed that, during the period named in the contract, he would not appear at any other theater. In *Montague v. Flockton,* L. R. 16 Eq. 189, the court, professing to follow the Lumley case, extended the rule to uphold an injunction where the contract of service contained no express negative stipulation. But Montague v. Flockton appears to have been in turn overruled by Whitman v. Hardman, 2 Ch. Div. 416, which distinctly refuses to approve the idea that an injunction is allowable in the absence of an express negative covenant to which the writ may give effect. *Taylor v. Nichols* (N. J. Ch.) (61 Atl. 946). And this, we think, is the prevailing rule in England at this time. There are cases in this country in which the negative covenant of an employé has been enforced by an injunction, and in some of them the courts have indulged in the suggestion, obiter, that the writ will lie to enforce an implied negative of this character. *Philadelphia Ball Club, v. Lajoie,* 202 Pa. 210 (51 Atl. 973, 58 L. R. A. 227, 90 Am. St. Rep. 627); *Cort v. Lassard,* 18 Or. 221 (22 Pac. 1054, 6 L. R. A. 653, 17 Am. St. Rep. 726); *Daly v. Smith,* 49 How. Prac. 150.

These dicta have not had general acceptation, and so far as the courts of last resort in this country have had occasion to speak in cases directly involving the question they have never extended the rule of Lumley v. Wagner to contracts containing no express negative covenant. This is not to say that a negative which is to be implied from a positive undertaking will not be respected by the courts. We can conceive that so long as the employé remains in the employer's service there is ordinarily an implied undertaking that he will not engage in any other service or business to the detriment of his employer's interests. He must not undertake to serve two masters. This covenant, though not expressed in terms, both law and equity will enforce on proper occasion. But every contract of hire is made with full knowledge by both parties of the power of either to put

an end to the service and to the relation of employer and employé at will even in disregard of the agreement, and if the employer wishes to bind the employé by a promise enforceable in equity not to enter the service of a rival or go into business for himself after the relation of employer and employé has been so severed, he must see to it that such stipulation is expressly embodied in the contract. Of course, this expression has reference only to the matter of the remedy, and has no application in an action at law for damages growing out of a violation of the terms of the contract whether express or implied. And, even where there is an express negative covenant, the authorities all agree that an injunction will not be granted save in those exceptional cases where the promised service is of a special, unique, unusual, and extraordinary or intellectual character which gives it peculiar value the loss of which cannot be reasonably or adequately compensated in damages in an action at law.

From the foregoing general statement as to the trend of American precedents on this question, we may except *Duff v. Russell,* 133 N. Y. 678 (31 N. E. 622), though even there we think the contract contained something more than an implied agreement not to enter the service of another during the period covered by the defendant's engagement. No opinion was filed in that case, but the essential facts may be gleaned from the head notes and are as follows: The defendant, Miss Lillian Russell, refused to carry out her agreement to sing at the plaintiff's theater and threatened to appear at a rival performance. To prevent this action on her part plaintiff sued out an injunction. Miss Russell sought to justify her conduct on the ground that the plaintiff insisted upon her appearing before the audience in tights, and she could not do so without danger of taking cold, but the court having ascertained from the record that defendant's physician had advised her to protect her health by " wearing something underneath her tights "

and that she had refused to follow the prescription "for reasons of her own," came to the seemingly uncharitable conclusion that her excuse was a mere pretense to avoid her contract, and sustained the injunction saying that an express negative covenant was not necessary to such equitable relief.

In the absence of an opinion in the cited case, we are left in doubt whether it was the special and unique or the intellectual character of the service demanded of the actress which the court relied upon as requiring the interposition of chancery to compel the defendant to appear in tights before a metropolitan audience, or refuse to do so at the peril of being held in contempt of court if she should exercise the ordinary right of a free person to earn her living in the pursuit of her chosen profession. We are strongly inclined to the view that the law there announced is opposed to the great weight of authority and that at the very most its controlling force as a precedent should be strictly limited to cases presenting an entirely parallel state of facts. Indeed, it may fairly be said that cases involving the employment of actors and public singers do constitute a peculiar and distinct class being somewhat of the nature of contracts with authors and playrights for their literary and dramatic productions, and that, for obvious reasons, the rules applicable thereto should not be extended to ordinary contracts of hire. It is well-established law that a writer may bind himself to sell another all his literary productions for a stated period. Likewise, the author of a play may sell another the exclusive right to place it on the boards. We may even suppose a case in which the play has never been put in print or in manuscript, but exists solely in the mind and memory of an actor playwright, and there will be no incongruity or unreasonableness in the proposition that even in such case he may bind himself by contract upon sufficient consideration to produce it solely and exclusively at a particular theater and while he cannot be compelled to specifically perform, equity will interpose to prevent his violation of his contract

by producing the play at another thater. But these cases differ widely from those involving a question of mere personal service in the ordinary meaning of that term. The play, even though it exists solely in the mind of its author, is something to which a property right may attach, and, while the law has no method by which to enforce its delivery to the purchaser, it may interpose to prevent its delivery to another.

Reasoning somewhat along the same lines it may be said that an actor's presentation of his part in a play of which he is not the author is a species of property. Though the lines are not his, yet he, in a very just sense, creates the part which he assumes, gives it his own interpretation, and clothes it with his own spirit. If the writer may sell and give property right in the naked unwritten or written lines may not the actor sell and give property right in his interpretation and presentation of those lines? Such, at least, seems to have been the idea of the courts for an examination will demonstrate that the use of the writ of injunction in the enforcement of contracts involving the rendition of personal service had its origin and has always had its most frequent application in an endeavor to afford proprietors of theaters and operas relief against artists who break their engagements to the serious loss of managers who have arranged the season's entertainments upon faith of these contracts. If, in addition to the reasons already suggested, we should admit that the peculiarly uncertain moods and carelessness of contract obligations which are sometimes said to characterize great histrionic and operatic genius and the peculiarly grievous embarrassment and injury which their violation of contracts brings upon their managers, call for the application of an exceptional and drastic remedy, we still think the courts should be very reluctant to admit either the necessity or propriety of its use where the duty sought to be enforced is merely ordinary, material, or mechanical and the fact that such duty requires skill and

experience is immaterial so long at least as the skill and experience are not of that exceptional kind and quality not to be found in the labor market.

In the case of Philadelphia Ball Club v. Lajoie, already cited, and on which appellant strongly relies, the defendant (a baseball player) entered into a contract expressly binding himself not to play for any other ball club for a named period without his employer's consent, and an injunction was granted for its enforcement. Possibly, the exten· sion to great baseball players of a rule especially applicable to great actors may be justified on the theory· that success in both professions requires exceptional dramatic ability, but the courts are not agreed upon that proposition and in a case involving the same kind of a contract which was enforced against Lajoie, injunction was denied on the ground that the service called for was not of the peculiar or extraordinary or intellectual kind in the enforcement of which equitable relief will be granted. *Baseball Co. v. Harper,* (Mo. C. C.) 54 Cent. Law J. 449. See, also, *Columbus Baseball Club v. Reiley* (Ohio), 25 Wkly. Law Bul. 385; *Harrisburg Baseball Club. v. Athletic,* 8 Pa. Co. Ct. R. 337. The case of *Daly v. Smith,* 49 How. Prac. 150, decided by an intermediate court of New York which is .often cited as upholding the doctrine contended for by the appellant herein was a·litigation based upon a contract containing an express negative covenant and the discussion indulged in by the court as to the rule where no such covenant exists is clearly dictum.·

It has also often been·held, and the rule is one having very general, though not universal, recognition, that equity will not interfere to compel specific performance of a con

4. SPECIFIC PER
FORMANCE.

tract·by one party where similar relief would not or·could not be granted against the other party upon his refusal to perform. *Luse v. Dietz,* 46 Iowa, 205; *Richmond ·v. Railroad,* 33 Iowa, 486; *Ormsby v. Graham,* 123 Iowa, 209; *Pomeroy's Eq.* (3d Ed.) Section

1405; 2 High on Injunctions (4th Ed.) Section 1109a; *Marble Co. v. Ripley,* 10 Wall. 339 (19 L. Ed. 955). In the Richmond case, *supra,* which involved a contract for service this court said: " Equity will not require defendants to perform their covenants unless plaintiffs, by a like proceeding, may be compelled to perform theirs; nor will it interfere unless it appear that defendants are not secure in their rights and remedies for a violation thereof by the plaintiffs." If the employer, though expressly bound by his contract to keep an employé in his service for a stated term of months or years, and not to discharge him during that period or to employ any other person in his stead, should elect to violate such agreement before the employé's term of service had expired no court, unless it be under very extraordinary circumstances, would undertake by decree of specific performance or by the negative process of injunction to compel such employer to continue his contract relation with the employé a single day beyond the time when for any reason, sufficient or insufficient, in law, he determines to sever them. If this be so, and we think its correctness will be admitted, then there is most palpable inequity, not to say injustice, in any rule which holds the employé to any service while his or her employer may violate the agreement at pleasure with no other penalty than the damages which may be assessed in a court of law. When a court of equity intervenes to compel the employé to specifically perform a contract for personal service, his service becomes involuntary, and his position becomes one of involuntary servitude, a condition utterly incompatible with our institutions, and the fundamental law of the land. *Clark's Case,* 1 Blackf. (Ind.) 122 (12 Am. Dec. 213.) The cited case, while not parallel in its facts, discusses a broad principle which applies with much force to cases like the one at bar. The plaintiff had bound herself by a voluntary contract to a long term of service from which she

desired to depart and, being detained by her employer, she sued out a writ of habeas corpus.   The court says:

> There are some covenants that may be specifically enforced in equity, but they are very different from the contract before us.   They are mostly covenants for the conveyance of real estate and in no case have any relation to the person.   But if the law were silent the policy of enforcing specific performance of a covenant of this nature would settle this question.   Whenever contracting parties disagree about the performance of their contract, and a court of justice interposes to settle their different rights their feelings become irritated against each other and the losing party feels mortified and degraded in being compelled to perform for the other what he had previously refused, and the more especially if that performance will place him frequently in the presence or under the direction of his adversary.   But this state of degradation, this irritation of feeling could be in no other case so manifestly experienced as in the case of a common servant where the master would have a continual right of covenant and the servant be compelled to a continual obedience.   Many covenants the breaches of which are only remunerated in damages might be specifically performed by a third person at a distance from the adversary or in a short space of time.   But a covenant for service if performed at all must be personally performed under the eye of the master and might as in the case before us require a number of years.   Such performance, if enforced by law, would produce a state of servitude as degrading and demoralizing in its consequences as a state of absolute salvery, and, if enforced in a government like ours which acknowledges a personal equality, it would be productive of a state of feeling more discordant and irritating than slavery itself.   Consequently if all other contracts were specifically enforced by law it would be impolitic to extend the principles to contracts for personal service.

In *De Rivafinoli v. Corsetti,* 4 Paige, Ch. (N. Y.) 264 (25 Am. Dec. 532), the eminent Chancellor Walworth while conceding *arguendo* that injunction will lie in a proper case, proceeds in a somewhat whimsical but very effective

way to illustrate the difficulty in which the court involves itself in attempting to specifically enforce contracts for personal service. The defendant in that case was a singer in Italian opera and threatened to abandon his contract with plaintiff who applied to the court for a writ of *ne exeat*. The Chancellor says:

It is charged in the bill not only that the defendant can sing, but also that he has expressly agreed to sing and to accompany that singing with such appropriate gestures as may be necessary and proper to give interest to his performance. And from the facts disclosed I think it very evident also that he does not intend to gratify the citizens of New York who may resort to the Italian opera either by his singing, or by his gesticulations. Although the authority before cited shows the law to be in favor of the complainant so far at least as to entitle him to a decree for the singing I am not aware that any officer of this court has that perfect knowledge of the Italian language or possesses that exquisite sensibility in the auricular nerve which is necessary to understand and enjoy with proper zest the peculiar beauties of Italian opera so fascinating to the fashionable world. There might be some difficulty therefore, even if the defendant were compelled to sing under the direction and in the presence of a master in chancery, in ascertaining whether he performed his engagement according to its spirit and intent. It also might be very difficult for the master to determine what effect coercion might produce upon defendant's singing, especially in the lighter airs, although the fear of imprisonment would unquestionably deepen his seriousness in the graver parts.

If a master in chancery would be at loss in directing and criticising the airs of an opera singer it is not too much to say that he would be even more embarrassed in supervising and directing the service which the defendant in the instant case undertook to perform. By what standard of law or of taste or pure or applied science is the court or the master to determine whether the defendant is a person of such "high mental culture and refinement,

strong and pleasing individuality, good address, prepossess-
ing appearance, knowledge of physical culture, ability as
a lecturer and high-class salesmanship," as to render her
services to the plaintiff so unique and exceptional that her
place cannot be filled by any of the hundreds of other
women of whom their friends may speak in equally glow-
ing terms of commendation? Under the rule contended
for, two courts of equal jurisdiction, passing upon two
cases involving the very same defendant and upon precisely
similar states of fact, may come to diametrically opposite
conclusions, and there is absolutely no standard by which
we may determine which is right. For this and other
reasons Mr. Freeman, in his note to the Lajoie case, 90 Am.
St. Rep. 648, expresses strong doubt of the soundness of
the rule which permits injunction in any case to enforce
either a positive or negative covenant for personal service.
He says the rule is impracticable because " it fixes no stand-
ard by which to determine whether the services contracted
for are unique and extraordinary or material, mechanical,
and ordinary." The solution of this question is left wholly
to the discretion of the court trying the case. Under exactly
similar facts one court may consider the services contracted
for as extraordinary while another court of equal standing
may consider them merely ordinary. In one case injunc-
tion is granted. In the other it is denied. This is shown
by the decision in the principal (Lajoie) case, as compared
with the decision in American Baseball Co. v. Harper, de-
cided by the circuit court of St. Louis. With reference to
these conflicting decisions to which we have already adverted
Mr. Freeman further notes that although both of these
defendants were ball players of national reputation em-
ployed under precisely similar contracts one goes out of
court with a solemn judicial finding that he is a person
of such attainments in his profession that his position cannot
possibly be filled. The other is solemnly decreed to be
simply an ordinary person whose place can easily be filled,

and whose absence from his post can result in no irreparable injury. Lajoie's professional reputation is established and enhanced at the cost of his freedom, while Harper gets his freedom at the expense of his professional reputation.

Directly opposed to the doctrine of *Duff v. Russell* is the case of *Hamblin v. Dinneford* from the same state reported in 2 Edw. Ch. 529. This involved the contract of an actor to play in the plaintiff's theater for a stated period with an express agreement not to play in any other theater without the plaintiff's consent. The court, after discussing the authorities, reached the conclusion that it is " a mere matter between employer and employed, and the parties should be left to law," and refused to sustain an injunction. To the same effect is *Sanquirico v. Benedetti,* 1 Barb. (N. Y.) 315; *Fredericks v. Mayer,* 1 Bosw. (N. Y.) 331. That courts of equity will not interfere to enjoin a party to a contract of hire which contains no negative covenant and then only in exceptional cases has been held in many other cases. Of them we may cite *Welty v. Jacobs,* 171 Ill. 624 (49 N. E. 723, 40 L. R. A. 98) ; *Taylor v. Nichols* (N. J. Ch.), 61 Atl. 946; *Burton v. Marshall,* 4 Gill. (Md.) 487 (45 Am. Dec. 171). See, also, as bearing in some measure on the same general propositions, *Arthur v. Oakes,* 63 Fed. 318 (11 C. C. A. 209, 25 L. R. A. 414) ; *Delavan v. Macarte,* 1 Ohio Dec. 226; *Sternberg v. O'Brien,* 48 N. J. Eq. 370 (22 Atl. 348) ; Bispham's Equity (6th Ed.), 591, and cases cited in note; Kerr on Injunctions, 466; *Caldwell v. Cline,* 8 Mart. (N. S. [La.]) 684; *Metropolitan E. S. Co. v. Gebler* (Eng.) 2 Ch. 799. *Davis v. Foreman* (Eng.) 3 Ch. 654; *Burney v. Ryle,* 91 Ga. 701 (17 S. E. 986.) Of the English case of Lumley v. Wagner, *supra,* and other cases following that precedent upon which appellant largely relies, it is said in Pomeroy's Equity Jurisprudence (3d Ed.) note to section 1314 that " the American courts have either generally rejected the doctrine of *Lumley v. Wagner* or have accepted it only to a partial extent."

Again, in note to section 1341 the same author says that "the English courts of equity have more freely used the injunction to prevent the violation of contracts than the majority of American judges have been willing to go. The tendency of the American courts has been to limit rather than to enlarge the jurisdiction in cases of contracts. English courts will enjoin the violation of some contracts even though they cannot be specifically enforced. The American decisions refuse to adopt this doctrine." In *Rice v. D'Arville* 162 Mass. 559 (39 N. E. 180), the question is not decided, but an opinion is strongly intimated that even an express negative covenant will not be enforced by injunction where the court has no power to specifically enforce the positive clauses of the contract. In *Electric Company v. Railroad,* 109 Ala. 190 (19 South. 721, 55 Am. St. Rep. 927), the court treats an injunction as a method of enforceing specific performance and, in refusing the writ, say that a court of equity " will not decree a party to perform a continuous duty extending over a series of years, but will leave the aggrieved party to his remedy at law."

Without pursuing the discussion further, we will say that, from as complete an examination as we have been able to give of the state of the law at this time with reference to the questions argued, we are satisfied that the better and greater weight of the authorities tend to these general conclusions: (1) That equity will not undertake to decree specific performance of contracts for personal service. (2) In the absence of an express negative covenant equity will not aid the, enforcement of such contract by injunction. (3) Even where there is an express negative covenant injunction will not be granted save in those exceptional cases where, by reason of the peculiar or extraordinary character of the promised service a violation of the agreement will cause injury to the other party for which an action at law will afford no adequate remedy.

In the instant case, even if the contract contained a

negative covenant, there is not such a showing of facts on behalf of the appellant as to bring it within the exception which justifies an injunction. While the petition does state that the services which appellee was to perform were unique and extraordinary, requiring peculiar and marked ability to prosecute them successfully, this is but the statement of a conclusion which is manifestly not supported by the pleaded facts. The mechanism of a front lace corset is not shown to be of such intricate and complicated design as to require surpassing talent for its solution, nor is anything alleged which tends to show why any other woman of intelligence, experience in the sale of goods and of fairly good address could not perform the required service with reasonable success. Nor can we see that the damage suffered or to be anticipated from the appellee's breach of her contract are of a peculiar or irreparable character.

**5. CONTRACTS OF EMPLOYMENT: breach: special qualification: pleading.**

The mere fact that she may not be financially responsible is not alone any reason for invoking the aid of equity in any case. Indeed, if we omit the merely complimentary and appreciative description of the appellee set forth in the petition (and which she could not be expected to deny) the allegation when reduced to brief terms is simply that appellee is an experienced and competent saleswoman who is capable of rendering to appellant valuable service, and that she has violated her agreement so to do. Experience, competency, and high degree of efficiency in exploiting and selling any brand of goods are qualifications which can hardly be so rare as to require the aid of equity to prevent irreparable loss by an employer who finds himself compelled to substitute one saleswoman for another.

**6. INJUNCTION: financial irresponsibility.**

This controversy in its essential nature differs in no manner from those arising daily between master and servant, employer and employé and, like them, its settlement is

peculiarly within the province of law, and not a subject of equitable consideration. It will be admitted, of course, that if in such employment appellee became possessed of valuable trade secrets concerning appellant's business she might be enjoined from disclosing them to others or from using them herself to the appellant's injury. The petition contains no such allegation. While it is charged that she has engaged in the manufacture and sale of a front lace corset similar to the one sold by the appellant no claim is made that appellant holds any patent or peculiar or exclusive right to deal in that article, or that appellee has appropriated any trade-mark or design belonging to the appellant or made use of any method or manner of competition which other dealers in the same line of trade might not legally and properly employ. The allegation that appellee is profiting by the experience and knowledge which she obtained in appellant's service alleges no legal wrong. The employé leaving an employer's service cannot leave the experience or knowledge there acquired, and, saving the matter of trade secrets already mentioned, these are legitimate additions to her personal equipment which she has a perfect right to use for her own benefit. *Rogers v. Rogers,* 58 Conn. 356 (20 Atl. 467, 7 L. R. A. 779, 18 Am. St. Rep. 278); *Sternberg v. O'Brien,* 48 N. J. Eq. 370 (22 Atl. 348); *Chain Belt Co. v. Van Sprekelsen,* 117 Wis. 106 (94 N. W. 78).

*7. TRADE SECRETS: skill; injunction.*

For the reasons stated, the ruling of the district court is *affirmed.*